[No. G003296. Fourth Dist., Div. Three. Apr. 10, 1987.]

SAV-ON DRUGS, INC., et al., Plaintiffs and Appellants, v.
COUNTY OF ORANGE et al., Defendants and Respondents.

COUNSEL

Baker, Ancel, Morris & Hruby, Mark G. Ancel and Raymond R. Hruby for Plaintiffs and Appellants.

Ajalat & Polley, Charles R. Ajalat, Terry L. Polley and Richard J. Ayoob as Amici Curiae on behalf of Plaintiffs and Appellants.

Adrian Kuyper, County Counsel, and Richard D. Oviedo, Deputy County Counsel, for Defendants and Respondents.

John K. Van de Kamp, Attorney General, and Timothy G. Laddish, Deputy Attorney General, as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**CROSBY, J.**—Under article XIII A of the California Constitution, increases in appraised values of taxable real property are severely restricted; but a change in ownership will permit reassessment. In this case we are called upon to decide whether a corporate merger constituted a "change of ownership," as that phrase is defined in the Revenue and Taxation Code and, if so, whether the Legislature's interpretation of article XIII A, as expressed in that code, is constitutional.

I

Two corporations owning real property brought suit against the County of Orange and 15 municipalities for refunds of ad valorem property taxes paid under protest. The case was tried on stipulated facts with the county counsel representing all defendants.

The agreed facts may be summarized as follows: Jewel Companies, Inc. (Jewel) formed a wholly owned subsidiary, Jewel Development Company (JDC), which made a combined cash and stock tender offer for all the shares

of then existing Sav-on Drugs, Inc. (Sav-on). Sav-on Realty, Inc. (Realty) was Sav-on's wholly owned subsidiary; both corporations held title to real property.

JDC initially bought 28.3 percent of Sav-on's issued shares for cash; and on November 6, 1980, the shareholders of Jewel and Sav-on approved a merger whereby all the outstanding Sav-on common stock was exchanged for preferred stock in Jewel.[1] Sav-on was merged into JDC on the same date, and appropriate filings were made with the California Secretary of State. JDC then changed its name to Sav-on Drugs, Inc. (JDC/Sav-on). JDC/Sav-on and its wholly owned subsidiary, Realty, are the plaintiffs in this action.

The merger was a reorganization within the meaning of section 368 (a)(1)(A) and (a)(2)(D) of the Internal Revenue Code and tax free for federal income tax purposes. The merger also qualified as a tax-free reorganization under this state's Revenue and Taxation Code section 24562, per the stipulated facts, "by implication since it has not been challenged to date by the California Franchise Tax Board."[2]

Plaintiffs made a timely filing with the county assessor pursuant to section 480, claiming the merger did not constitute a change in ownership of the real property of either JDC/Sav-on or Realty. Nevertheless, the assessor levied escape assessments on plaintiffs' real property located in the respective defendants' jurisdictions in 1982. Plaintiffs challenged the assessments because they exceeded the market value assigned for the base year 1975-1976, plus lawful increments, allegedly in violation of article XIII A of the California Constitution.

Plaintiffs exhausted their administrative remedies. The Assessment Appeals Board of the County of Orange rejected their claim based on advice contained in a letter from the State Board of Equalization that mergers of this type constitute changes in ownership per section 64, subdivision (c). Plaintiffs then brought a variety of statutory and constitutional attacks on the reassessment in the trial court and now renew them here. We consider the issues raised in the same sequence, noting that because the method of

---

[1] In a letter to the Internal Revenue Service requesting a ruling as to the federal tax consequences of the proposed merger, counsel representing Jewel, JDC, and Sav-on wrote, "The shares of Sav-on Common Stock then owned by Jewel and acquired through the Tender Offer, as well as all treasury shares of Sav-on, will be cancelled pursuant to the terms of the Agreement of Merger. Upon consummation of the merger, [JDC] will, by operation of law and *without any deed or other documents of transfer,* succeed to the *assets* and liabilities of Sav-on." (Italics added.) The merger agreement itself employs similar language.

[2] All further references are to the Revenue and Taxation Code unless otherwise indicated, except in the case of article XIII A which is always a reference to that provision of the California Constitution.

valuation and not the result was in issue and the matter was submitted on stipulated facts below, the trial court was presented with purely legal questions and its statement of decision is not binding on us. (*Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].)

## II

The first question involves a problem of statutory construction: Which subdivision, (b) or (c), of section 64 applies to this transaction?

Section 64 was part of a legislative effort to interpret the manifold ambiguities of the so-called Jarvis-Gann initiative, Proposition 13, which added article XIII A to the Constitution of California in 1978.[3] Article XIII A, section 2 provides in part, "(a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, *or a change in ownership has occurred* after the 1975 assessment. . . ." (Italics added.) Subdivision (d) of article XIII A, section 2, added in 1982, provides an exception for changes in ownership forced by the exercise of eminent domain.

As a practical matter, corporate realty can be acquired in various ways. The land may be obtained directly from the corporation by deed, or the corporation itself may be acquired by a stranger who purchases its stock for cash or, as in this case, shares of its own stock. At the same time a mere adoption of the corporate form by the current owners or a reorganization of a corporate structure may appear to be a de facto acquisition of real property by others without being so in substance. Which of these transactions should be considered as changes in ownership per article XIII A?

In section 64 the Legislature has adopted a definition of "change of ownership" for reassessment purposes that includes our first example, outright sale of either the land or the company to a stranger, while exempting the second, a mere change in the *form* of ownership or corporate organization. It rather obviously determined reassessments may not be avoided under article XIII A via the simple expedient of disguising transfers of realty by means of selling all or a majority of the stock in real estate holding compa-

---

[3] Article XIII A was upheld against a general constitutional attack in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281]. That case also instructs us that the "legislative and administrative implementations are traditionally accorded great weight by the courts in construing enactments such as article XIII A." (*Id.,* at p. 246.)

nies. In other words, the Legislature has determined article XIII A was meant to apply in the case of "true" changes in ownership but not "paper" ones.

 Touring the legal minefield the Legislature deployed to express this seemingly straightforward understanding of the electorate's intention, we bear in mind that our fact situation falls between the relatively simple extremes we have postulated. Here the old owners remain in the *parent* corporation, but they are minority shareholders and do not control the merged corporation and its wholly owned subsidiary, either in fact or under the Revenue and Taxation Code definition of control. Section 25105 states, "Direct or indirect ownership or control of more than 50 percent of the voting stock of the taxpayer shall constitute ownership or control for the purposes of this article"; and that provision is incorporated by reference in section 64, subdivision (c).

At the time of this merger, section 64, subdivision (a) stated, "Except as provided in subdivision (h) of Section 61 and subdivision (c) of this section the purchase or transfer of ownership interests in legal entities, such as corporate stock or partnership interests, shall not be deemed to constitute a transfer of the real property of the legal entity." Section 61, subdivision (h) deals with transfers of stock in cooperative housing corporations.[4]

Subdivision (c) of Section 64 *now* provides,[5] "When a corporation, partnership, other legal entity or any other person obtains control, as defined in Section 25105, in any corporation, or obtains a majority ownership interest in any partnership or other legal entity through the purchase or transfer of corporate stock, partnership interest, or ownership interest in other legal entities, such purchase or transfer of such stock or other interest shall be a change of ownership of property owned by the corporation, partnership, or other legal entity in which the controlling interest is obtained."

Although subdivision (c) would appear to specifically apply to our facts, plaintiffs claim otherwise. They remind us that the shareholders of Sav-on remain proportionate shareholders of Jewel, the parent of the survivor of the merger, JDC/Sav-on, and that the stock transfer was obviously not a sham for the purpose of transferring the ownership of real estate to avoid

---

[4]In 1980 the Legislature added new subdivision (d) to section 64, and it was listed with the two other subdivisions already excepted from subdivision (a). Although the situation described in subdivision (d) of section 64 would have no direct application to the present case by its very terms, it is of some interest as an insight into the Legislature's own understanding of its statutory scheme. Subdivision (d) concludes, "A transfer of shares or other ownership interests which results in a change in control of a corporation, partnership, or any other legal entity is subject to reappraisal as provided in subdivision (c) rather than this subdivision."

[5]The difference is that partnerships and other legal entities were not added to the statute until shortly after this reassessment, but more of that anon.

reassessment; i.e., this transaction involved the transfer of an ongoing enterprise in the main, not real property. They also note the federal government has directly recognized the tax-free nature of the exchange for income tax purposes and the state itself has done the same by implication. ■ Among a host of other arguments, plaintiffs suggest subdivision (b), acknowledged by all parties to be an exception to subdivision (c), must apply under the present circumstances. We disagree.

At the time of acquisition, the first portion of subdivision (b) provided, "Any corporate reorganization, by merger or consolidation, where all of the corporations involved are members of an affiliated group, *and* which qualifies as a reorganization under Section 368 of the United States Internal Revenue Code and which is accepted as a nontaxable event by similar California statutes, or any transfer of real property among members of an affiliated group shall not be a change of ownership. The taxpayer shall furnish proof, under penalty of perjury, to the assessor that the transfer meets the requirements of this subdivision." (Italics added.)[6]

JDC/Sav-on met the requirements of the Internal Revenue Service and, apparently, the State Board of Equalization to accomplish a tax-free transaction; and it provided the proper proof under penalty of perjury. But was the merger between "members of an affiliated group"? For the answer to that question we look to the balance of subdivision (b). It states, "For purposes of this subdivision 'affiliated group' means one or more chains of corporations connected through stock ownership with a common parent corporation if: [¶] (1) One hundred percent of the voting stock, exclusive of any share owned by directors, of each of the corporations, except the parent corporation, is owned by one or more of the other corporations; and [¶] (2) The common parent corporation owns, directly, 100 percent of the voting stock, exclusive of any shares owned by directors, of at least one of the other corporations."

Before the acceptance of the tender offer, JDC and the acquired entities were concededly not affiliated because a minority shareholder does not meet the 100 percent requirement of subdivision (b)(2). ■ Nevertheless,

---

[6]There is no claim that the merger did not satisfy section 368 of the Internal Revenue Code, but plaintiffs devote considerable effort to persuade us this alone should be sufficient to qualify for treatment under subdivision (b) of section 64. Rather than respond at similar length, we have merely emphasized the conjunctive "and" in the subdivision. It is the first part of the equation that plaintiffs cannot satisfy, and they must accomplish both by its literal and obviously intended meaning.

The words "by merger or consolidation" were deleted in 1982. (Neither West's nor Deering's Codes reflect this particular change. See Stats. 1982, ch. 1465, § 5.) Since affiliated corporations, as well as unaffiliated ones, can accomplish a merger or consolidation, we do not ascribe the significance to the former inclusion of those words plaintiffs urge upon us.

plaintiffs claim they were affiliated companies within the meaning of subdivision (b) because in the instant before the merger agreement was filed "JDC had the beneficial ownership of all of the stock of [Sav-on]. It could have gone into court and insisted upon specific performance of the merger agreement, had [a Sav-on] shareholder who had tendered his stock sought to preclude implementation of the merger agreement. . . . [Jewel] owned JDC wholly. The instant before the filing of the merger agreement all of the stock which had been issued and outstanding in the hands of shareholders of [Sav-on] had either been purchased or tendered to JDC." In the letter to county assessors referred to in the stipulated facts, the State Board of Equalization took a contrary position with respect to this type of transaction: "It is important to remember that in order to qualify under Section 64[, subdivision] (b), the organizations involved must be an affiliated group *before* the merger takes place; and, becoming an affiliated group cannot be just one step in the reorganization."

 If subdivision (b) is to be read as plaintiffs suggest, the "ultimate control" principle determined by the Legislature in subdivision (c) will be rather easy to avoid. Construing the two subdivisions together in a common-sense manner, however, it is clear the Legislature understood Proposition 13 to mean a reassessment should be permitted when, using control of the entity as its touchstone, a true change in ownership occurs (subd. (c)), but not otherwise (subd. (b)).

The legislative history confirms our interpretation. After the passage of Proposition 13, the Speaker of the Assembly created a Task Force on Property Tax Administration to assist the Legislature in implementing article XIII A. The Task Force report was published on January 22, 1979.

The Task Force suggested the amendment should be construed on the basis of the traditional "separate entity" theory, i.e., the notion found in our general law that corporations, partnerships, joint ventures, and associations have an identity apart from that of the owners. Several reasons were given: (1) Shareholders and partners have no individual possessory rights in the entity's real property. (2) Any other method would present serious problems of administration and enforcement. And (3) the unpredictable nature of potential ripple effects of disregarding the general law on the subject presented an unknowable risk.

The Legislature generally followed the Task Force recommendations but not in this area. A report of the Assembly's Revenue and Taxation Committee stated, "Transfers *between* different legal entities DOES [*sic*] constitute a change in ownership, however. For example, a transfer of property between two non-affiliated corporations, a partnership and a corpora-

tion, or a partnership and an individual are all changes in ownership. This was termed by the Task Force as the 'separate entity theory,' in which the general laws of the state endowing corporations, partnerships, joint ventures, associations and so forth with an identity separate from its owners is respected. To tax transactions among entities and individuals was considered to be quite important in order to head off two-step transactions of property from one person to another via a corporation, (i.e., A incorporates his home or business, then sells 100% of stock in corporation to B, who may then dissolve the corporation and own the home or business), which would otherwise escape reappraisal. [¶] The majority-takeover-of-corporate-stock provision deviates from this general theory, and represents an 'ultimate control' rationale. This provision was enacted out of a concern that, given the lower turnover rate of corporate property, mergers or other transfer of majority controlling ownership should result in a reappraisal of the corporation's property—an effort to maintain some parity with the increasing relative tax burden of residential property statewide, due to the more rapid turnover of homes. It was also a trade-off for exempting transfers among 100% wholly-owned corporations." (1 Assem. Rev. & Tax. Com. Rep. on Property Tax Assessment (Oct. 29, 1979) p. 27.)

■■■ Thus, the State Board of Equalization's advisory letter is reflective of the Legislature's intent. Also, plaintiffs' specific enforcement argument is both specious and proves too much. Home buyers could make the same claim, i.e., because they have the right to specific performance by reason of an executed sales agreement, the close of escrow only signifies a "reorganization" of that which they already owned. There is obviously a sale nonetheless. Moreover, if this merger occurred *in fact* before it did officially, there was still a merger, in our view, not merely a reorganization. Two mergers do not add up to *no* mergers, nor do one merger and one reorganization. If a de facto merger did occur when the offer was accepted, as plaintiffs essentially argue, subdivision (c) was applicable at *that* time and the real property was ripe for reassessment then. For this reason, and in light of the evident legislative understanding of article XIII A, we hold this merger was not a reorganization within the meaning of subdivision (b).

III

A

■■■ Plaintiffs next argue that subdivision (c) of section 64 is unconstitutional for a variety of reasons or simply does not control this transaction. The first claim is that, as applied to them, subdivision (c) is unconstitutional because it "provides [] there shall be a change of ownership of property *owned by the corporation in which the controlling interest is obtained.* Controlling

interest was obtained in [Sav-on]. Nothing [] happened to [Realty]." We fail to perceive any constitutional difficulty based on this contention. It is to be remembered that section 64 is a legislative interpretation of the Constitution, not a statute created in a vacuum. If article XIII A refuses to recognize a difference between corporations and the subsidiaries they control for reassessment purposes, so be it; the article is part of the Constitution. To be unconstitutional subdivision (c) would have to conflict with article XIII A or some other provision of the Constitution, but it does not. Subdivision (c) is, as we will conclude below, a perfectly reasonable interpretation of article XIII A.

The real argument on this point appears to be that the specific statute, section 64, subdivision (c), does not apply with respect to property owned by Realty, despite plaintiffs' concession that control of Realty has passed from Sav-on to Jewel and JDC/Sav-on. But the subdivision reads to the contrary: "when a corporation . . . obtains control . . . in any corporation . . . ." Control is defined in section 25105 as either "direct or indirect." Also, the State Board of Equalization has promulgated a rule to cover the point. Rule 462(j)(4)(A) states a change in ownership occurs "[w]hen any corporation, partnership, other legal entity or any person: . . . (iii) obtains direct or indirect ownership or control of more than 50 percent of the total ownership interest in any other legal entity . . . [¶] all of the property owned directly or indirectly by the acquired legal entity is deemed to have undergone a change in ownership." (Cal. Admin. Code, tit. 18, § 462.)

As to any real property held directly by JDC/Sav-on, Corporations Code section 1109 provides in part, "the making and filing of the agreement of merger or consolidation or certificate of ownership or certificate of merger vests in the surviving or consolidated corporation all the real property of any disappearing corporation, the filing for record in the office of the county recorder of any county in this state in which any of the real property of such disappearing corporation is located of . . . the agreement of merger . . . shall evidence record ownership in the surviving or consolidated corporation of all interest of such disappearing corporation in and to the real property located in that county."

Moreover, to adopt plaintiffs' interpretation would effectively stifle the electorate's intent, as construed by the Legislature, that a change in control, direct or indirect, will permit a reassessment. Any reassessment could be avoided by a simple step transaction involving the creation of a wholly owned subsidiary for the purpose of holding title to corporate realty, if plaintiffs' position were to be adopted.

We are also urged to embrace plaintiffs' interpretation of subdivision (c) because the Legislature has rejected proposed amendments to the subdivi-

sion which would have specifically included language referring to corporate subsidiaries. (Sen. Bill No. 1260 (1979-1980 Reg. Sess.); Assem. Bill No. 2777 (1979-1980 Reg. Sess.).) There are several answers to that suggestion. The Legislature may have objected to other portions of the bills, for example, and not felt any further clarification of the status of subsidiaries was necessary. Although it may be true that "[t]he rejection by the Legislature of a specific provision contained in an act *as originally introduced* is most persuasive to the conclusion that the act should not be construed to include the omitted provision" (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512], italics added; see also *Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 825 [125 Cal.Rptr. 348]), for the reasons stated above, there is relatively little value in examining an existing statute in light of proposed amendments which have not been approved. (*Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 735, fn.7 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161]; *Burgess* v. *Board of Education* (1974) 41 Cal.App.3d 571, 580-581 [116 Cal.Rptr. 183]; *Oakland Police Officers Assn.* v. *City of Oakland* (1973) 30 Cal.App.3d 96, 101 [106 Cal.Rptr. 134].)

### B

■ It is next contended that subdivision (c) of section 64 is unconstitutional because it "ignores the separate and distinct identities of [JDC/Sav-on] and its shareholder Jewel." We fail to see the slightest constitutional infirmity based on this claim. When it passed article XIII A, the electorate was perfectly free to ignore the separate identities of corporations and their shareholders by constitutional amendment, if it so chose. And section 64 is the Legislature's interpretation of the Constitution, specifically article XIII A. There is nothing in that article or the balance of the Constitution forbidding the legislative determination; and the Legislature's interpretation is entitled to great weight, as we have previously noted. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 246.)

Also, plaintiffs' argument is premised on the truism that shareholders own shares, not the specific assets of the corporation. But, to repeat, that distinction applied in this context would be the practical repeal of article XIII A's reassessment provision, as the Legislature recognized.

### C

■ Plaintiffs charge the Legislature has unlawfully abridged the Constitution by undertaking to define the phrase "change of ownership" as used in article XIII A in the first place and has changed its meaning in the process as well. Our Supreme Court recently disposed of the same argument in the context of another legislative interpretation of article XIII A in these words: "When a constitutional provision has a doubtful or obscure meaning, there

is a strong presumption in favor of the Legislature's interpretation of the provision. [Citations.]" (*Heckendorn* v. *City of San Marino* (1986) 42 Cal.3d 481, 488 [229 Cal.Rptr. 324, 723 P.2d 64].)

We answered a similar contention in a like vein in *Brown* v. *Community Redevelopment Agency* (1985) 168 Cal.App.3d 1014 [214 Cal.Rptr. 626]: "As a general rule, legislative enactments are presumed to be constitutional; if 'more than one reasonable meaning [of a provision of the Constitution] exists, it is our duty to accept that chosen by the Legislature. [Citations.]' (*Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 652 [298 P.2d 1].) And 'apparent ambiguities frequently may be resolved by the contemporaneous construction of the Legislature . . . .' (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* [*supra*] 22 Cal.3d 208, 245.) Or, put another way, ' "where a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling. When the Legislature has once construed the [C]onstitution, for the courts then to place a different construction upon it means that they must declare void the action of the Legislature. It is no small matter for one branch of the government to annul the formal exercise by another and coordinate branch of power committed to the latter, and the courts should not and must not annul, as contrary to the [C]onstitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the [C]onstitution. This is elementary." ' [Citations.]" (*Id.,* at p. 1019; see also *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 624 [194 Cal.Rptr. 294] ["it becomes clear that the absence in article XIII A of express authority for the legislative interpretation is less significant than the absence in the article of any express or necessarily implied prohibition against such interpretation"].)

We see no derogation of the will of the electorate in the Legislature's interpretation of article XIII A. Indeed, that could have been the result had the Legislature failed to act or had it chosen the narrow definition of change of ownership suggested by the Task Force and championed by plaintiffs. It is true that Proposition 13 was a tax containment measure, but it does provide for reassessments under certain circumstances. The Legislature has simply fostered article XIII A's reassessment provisions and, consequently, implemented the will of the electorate.

 Nor have corporations been singled out unfairly in a manner not contemplated by the voters; the opposite is true. If the Legislature had not clarified the phrase "change of ownership" as it did, corporations might have enjoyed an unjustifiable and unintended advantage over individuals in the buying and selling of real estate. Plaintiffs' real complaint is that they have

*not* received special treatment. They have only been treated equally and must, like individuals who acquire control of real estate, undergo a reassessment, even where the seller retains a minority interest.

Plaintiffs additionally argue that until subdivision (c) was amended in 1980 to add partnerships and other legal entities, corporations (and individuals) unfairly bore the brunt of article XIII A's reassessment provision. To this there are several answers. The most obvious is, the Legislature has cured this omission and there is no longer cause to complain. ■ Also, the contention is premised on the idea that one taxpayer ought to be able to take advantage of loopholes that serendipitously apply to others, a notion that would seriously endanger any taxing scheme yet devised by humankind, we imagine. ■ It is undoubtedly true, as plaintiffs tell us, that "the voters ... did not intend to classify corporations in a fashion different from [] individuals." But by enacting section 64, the Legislature has adopted an interpretation resulting in a *more* equal treatment of corporations vis-à-vis individuals and, with the 1980 amendment, has extended that equality by the addition of partnerships and other legal entities.

Plaintiffs also contend they were denied equal protection because partnerships and other legal entities were not listed in subdivision (c) of section 64 on the date of the reassessment even though they were added later the same year. ■ The argument overlooks the fact that subdivision (c) is not part of article XIII A; it is part of the Legislature's *interpretation* of that provision. Since the Legislature has now decided that partnerships and other legal entities should be specifically listed, it follows they were and always should have been included. In other words, the Constitution has not changed in this respect, only the Legislature's construction of Article XIII A.

Thus, partnerships and other legal entities were covered by the article itself from the outset in the same manner as corporations. The Legislature's initial failure to so conclude may have been erroneous, but was not a denial of equal protection to these plaintiffs. ■ As noted above, if one group of taxpayers is incorrectly allowed to escape an applicable tax or reassessment by *any* of the branches of government, it hardly follows that everyone else must be similarly blessed. If a perfectly fair scheme of taxation has ever been created, we are not aware of it.

Also, plaintiffs' owners chose to operate them as corporations rather than as partnerships or other legal entities. They were surely aware that our law is replete with examples of different treatment of corporations, as opposed to partnerships or other entities, in virtually every area, including taxation.

D

■ Finally, we are told the Legislature's definition of "control" somehow denies plaintiffs equal protection. The definition of control is simple, a majority of the shares held directly or indirectly. (§§ 25105; 64, subd. (c).) Nonetheless, since in the case of large corporations it is possible to obtain control by the acquisition of far less than a majority of the shares, some corporations are treated differently than others when control is transferred, plaintiffs claim.

Although JDC/Sav-on could not prevail under *any* definition of corporate control since it acquired *all* of Sav-on's outstanding shares, we would hold the Legislature's interpretation of article XIII A has a rational basis even if JVC had purchased but a bare majority of the shares. The vicissitudes of corporate control in the business world are often as mercurial and confused as the marital history of Henry VIII. We can imagine situations where it simply could not be determined, e.g., a model corporation in which 100 shareholders own one share each. To require every county assessor in the state to make a continuing determination of "control" of all the corporations which own real property within its borders, based on Wall Street definitions of the term, would invite chaos. The safest definition, one which is reasonably certain and relatively easy to apply, i.e., a simple majority, was adopted. It can hardly be termed irrational.

Judgment affirmed. Respondents shall have costs on appeal.

Trotter, P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied April 29, 1987, and on May 7, 1987, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied July 16, 1987. Kaufman, J., did not participate therein.