[No. S001002. Feb. 27, 1989.]

TITLE INSURANCE AND TRUST COMPANY, Plaintiff and Appellant, v.
COUNTY OF RIVERSIDE et al., Defendants and Appellants.

**COUNSEL**

Wyman, Bautzer, Christensen, Kuchel & Silbert, Wyman, Bautzer, Rothman, Kuchel, Silbert, Allan B. Goldman, Susan J. Williams and Jerold Fagelbaum for Plaintiff and Appellant.

Thomas H. Steele, Charles J. Moll III, Lucia M. Diamond, Morrison & Foerster, Ajalat & Polley, Charles R. Ajalat, Terry L. Polley and Richard J. Ayoob as Amici Curiae on behalf of Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Edmond B. Mamer, Patti S. Kitching, Timothy G. Laddish, Deputy Attorneys General, Gerald J.

Geerlings, County Counsel, W.W. Miller, Peter H. Lyons, Chief Deputy County Counsel, Loyal E. Keir and James J. Brzytwa, Deputy County Counsel, for Defendants and Appellants.

Adrian Kuyper, County Counsel (Ventura), and David R. Chaffee, Deputy County Counsel, as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

**MOSK, J.**—Under Proposition 13 (Cal. Const., art. XIII A), ad valorem taxes on real property are limited to 1 percent of full cash value. (*Id.,* § 1, subd. (a).) However, property that changed ownership after the 1975-1976 tax year is subject to reassessment. (*Id.,* § 2, subd. (a).)[1] In order to determine whether such a change has occurred as to property owned by various legal entities, including corporations, the Legislature enacted section 64 of the Revenue and Taxation Code.[2] Subdivision (a) states that, with certain

---

[1] Proposition 13 was added to the Constitution as article XIII A by initiative on June 6, 1978. Section 1 provides in subdivision (a) that "The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property." Section 2, subdivision (a), provides that "The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or *a change in ownership* has occurred after the 1975 assessment." (Italics added.)

[2] Section 64 provides as follows: "(a) Except as provided in subdivision (h) of Section 61 and subdivisions (c) and (d) of this section, the purchase or transfer of ownership interests in legal entities, such as corporate stock or partnership interests, shall not be deemed to constitute a transfer of the real property of the legal entity.

"(b) Any corporate reorganization, where all of the corporations involved are members of an affiliated group, and which qualifies as a reorganization under Section 368 of the United States Internal Revenue Code [26 U.S.C. § 368] and which is accepted as a nontaxable event by similar California statutes, or any transfer of real property among members of an affiliated group shall not be a change of ownership. The taxpayer shall furnish proof, under penalty of perjury, to the assessor that the transfer meets the requirements of this subdivision.

"For purposes of this subdivision 'affiliated' group means one or more chains of corporations connected through stock ownership with a common parent corporation if:

"(1) One hundred percent of the voting stock, exclusive of any share owned by directors, of each of the corporations, except the parent corporation, is owned by one or more of the other corporations; and

"(2) The common parent corporation owns, directly, 100 percent of the voting stock, exclusive of any shares owned by directors, of at least one of the other corporations.

"(c) When a corporation, partnership, other legal entity or any other person obtains control, as defined in Section 25105, in any corporation, or obtains a majority ownership interest in any partnership or other legal entity through the purchase or transfer of corporate stock, partnership interest, or ownership interest in other legal entities, such purchase or transfer of such stock or other interest shall be a change of ownership of property owned by the corporation, partnership, or other legal entity in which the controlling interest is obtained.

exceptions set forth therein, the purchase or transfer of corporate stock is not a transfer of the property of the corporation. Thus, unless an exception to this general rule applies, a transfer of shares of stock does not result in reassessment of a corporation's property under Proposition 13. We are concerned with one of those exceptions, provided in subdivision (c) (hereinafter section 64(c)).[3] ■ Our inquiry is whether section 64(c) applies,

---

"(d) If property is transferred on or after March 1, 1975, to a legal entity in a transaction excluded from change in ownership by paragraph (2) of subdivision (a) of Section 62, then the persons holding ownership interests in such legal entity immediately after the transfer shall be considered the 'original coowners.' Whenever shares or other ownership interests representing cumulatively more than 50 percent of the total interests in the entity are transferred by any of the original coowners in one or more transactions, a change in ownership of that real property owned by the legal entity shall have occurred, and the property which was previously excluded from change in ownership under the provisions of paragraph (2) of subdivision (a) of Section 62 shall be reappraised.

"The date of reappraisal shall be the date of the transfer of the ownership interest representing individually or cumulatively more than 50 percent of the interests in the entity.

"A transfer of shares or other ownership interests which results in a change in control of a corporation, partnership, or any other legal entity is subject to reappraisal as provided in subdivision (c) rather than this subdivision.

"(e) In order to assist in the determination of whether a change of ownership has occurred under subdivisions (c) and (d), the Franchise Tax Board shall include a question in substantially the following form on returns for partnerships, banks and corporations (except tax-exempt organizations):

"If the corporation (or partnership) owns real property in California, has cumulatively more than 50 percent of the voting stock (or more than 50 percent of total interest in both partnership capital and partnership profits) (1) been transferred by the corporation (or partnership) since March 1, 1975, or (2) been acquired by another legal entity or person during the year? (See instructions.)

"If the entity answers 'yes' to (1) or (2) in the above question, then the Franchise Tax Board shall furnish the names and addresses of that entity and of the stock or partnership ownership interest transferees to the State Board of Equalization."

At the time of the merger involved here, in July 1979, Revenue and Taxation Code, section 64, subdivision (c), referred to one corporation obtaining control, as defined in Revenue and Taxation Code, section 25105, in "another" corporation. (Stats. 1979, ch. 242, § 4, p. 510.) Two months later, when the statute was applied to this transaction, the section had been amended to refer to a corporation obtaining control, as defined in Revenue and Taxation Code section 25105, in "any" corporation. (Stats. 1979, ch. 1161, § 4, p. 4365.) Thereafter, in 1980, the section was amended to its present form, rendering its terms applicable not only to corporations, but to acquisition of majority ownership interests in partnerships and other legal entities as well. (Stats. 1980, ch. 1349, § 2, p. 4769.) We see no significance in these successive changes to the problem we confront in the present case.

All statutory references are to the Revenue and Taxation Code unless otherwise noted.

[3] Prior to the enactment of section 64, a task force, at the direction of the Legislature, studied the implementation of Proposition 13. In a report filed before section 64 was enacted, it considered whether to recommend that the Legislature adopt the "ultimate control" test to measure a change of ownership of property when corporate stock changed hands, or the "separate identity" test. The former standard looks through the legal entity to determine whether property has changed ownership, so that a change would occur if a single shareholder gained majority control of the corporation through the purchase of shares. Under the second test, the ownership would remain with the entity that held title thereto. The task force

so as to require reassessment, where, as here, one corporation purchases all the shares of stock of another, and the real property allegedly subject to reassessment is owned not by the corporation whose stock has been purchased but by a wholly owned subsidiary of that corporation.

In 1979, Spicor, a wholly owned subsidiary of Southern Pacific Company (hereinafter Southern Pacific), merged into Ticor, another corporation, by the conversion of Spicor's shares of common stock into common stock of Ticor. As a result of the merger, Ticor became a wholly owned subsidiary of Southern Pacific. Ticor, both before and after the merger, held a wholly owned subsidiary, Title Insurance and Trust Company (hereinafter TI), which owned property in both Riverside and Merced Counties. The issue is whether this transaction resulted in a "change of ownership" of TI's property under section 64(c).

Shortly after the merger, the State Board of Equalization (the board) issued a letter to county assessors advising them that under section 64(c), the acquisition of a corporation through a stock transfer results in a change of ownership of real property owned not only by the parent company but by a subsidiary of the parent, and that, therefore, such a transfer requires reappraisal of the real property owned by the parent through its ownership of the subsidiary. A month later, the board made this advice explicitly applicable to the transaction involved here by a letter advising assessors that any real property owned by Ticor and its subsidiaries, including TI, was subject to reappraisal by reason of a change of ownership under section 64(c). In conformity with this advice, in 1980 the Riverside County Assessor reassessed two parcels of real property owned by TI and located in that county, resulting in an increase in the roll value of the property. The same course was followed by the assessor in Merced County as to real property in that county owned by TI.

TI sought to change these assessments before the assessments appeals board in each county, claiming that there was no basis for the reappraisals because the merger of Spicor into Ticor did not result in a change in the ownership of TI's properties under section 64(c). The applications were denied on the ground that the assessment appeals boards did not have jurisdiction to rule on the legal issue presented by TI. TI paid the additional taxes resulting from these reassessments under protest in December 1980 and April 1981.

recommended that the "separate entity" theory be adopted, with one exception as to housing cooperatives.

The "separate entity" theory was in fact adopted by the Legislature as the general rule when it provided in subdivision (a) of section 64 that the transfer of corporate stock is not deemed a transfer of the real property of a legal entity. However, just as clearly, it made an exception to this rule in subdivision (c): the statement of the general rule is preceded by the words "Except as provided in . . . subdivision . . . (c)."

In July 1981, it filed complaints in the Superior Courts of Riverside and Merced Counties against the counties and the State Board of Equalization (defendants) seeking a refund of the alleged overpayments, and for declarations that section 64(c) did not apply to property owned by it. The cases were coordinated for trial and assigned to the Riverside County Superior Court. That court ruled in favor of TI, holding that section 64(c) does not apply to subsidiaries of acquired corporations, and that TI was entitled to a refund of taxes for 1980-1981. The Court of Appeal affirmed.[4]

Section 64(c) incorporates the definition of "control" contained in section 25105.[5] The two sections, when read together, provide that when a corporation "obtains [direct or indirect control of more than 50 percent of the voting stock] . . . in any [other] corporation . . . through the purchase or transfer of corporate stock . . . such purchase or transfer . . . shall be a change of ownership of property owned by the corporation in which the controlling interest is obtained."

■■ In interpreting the meaning of a statute we begin, as we must, with the language used. Under familiar rules of construction, words in a statute must be given the meaning they bear in ordinary usage (*In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789]); the meaning of the enactment may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323]).

■ Turning to the language of section 64(c), the words used do not appear to us to be ambiguous. The section provides, in essence, that if one

---

[4] In an opinion filed before the matter we review here, the Court of Appeal also held in favor of TI. We granted review on July 16, 1987, and retransferred the matter to the Court of Appeal for reconsideration in the light of *Sav-on Drugs, Inc.* v. *County of Orange* (1987) 190 Cal.App.3d 1611 [236 Cal.Rptr. 100]. *Sav-on* held that section 64(c) applied so as to require reassessment of property because of the transfer of corporate stock under the circumstances involved in that case. In the course of its opinion, the *Sav-on* court made various statements which are relevant to the issue before us and favor defendants' view of the meaning of section 64(c).

Following our retransfer, the Court of Appeal held that *Sav-on* was distinguishable, and reaffirmed its prior decision. The parties disagree as to whether *Sav-on* is in fact distinguishable, and TI argues that the statements made in *Sav-on* that favor defendants' view of the meaning of section 64(c) are dictum. At this stage of the proceeding we are not primarily concerned with whether *Sav-on* can be distinguished on its facts from the present case. Even if the statements favoring defendants' position are dictum, we refer to them in this opinion insofar as they are relevant to our discussion of the proper construction of section 64(c).

[5] Section 25105 provides: "Direct or indirect ownership or control of more than 50 percent of the voting stock of the taxpayer shall constitute ownership or control for the purposes of this article."

corporation either directly or indirectly obtains control over another by the transfer or purchase of stock, a change of ownership occurs as to the real property owned by the corporation over which it has obtained direct or indirect control. Here, Southern Pacific obtained indirect control of TI as a result of the purchase of Ticor stock, since the merger resulted in Southern Pacific's ownership of Ticor, a wholly owned subsidiary of Southern Pacific, and TI was Ticor's wholly owned subsidiary. Ergo, such indirect control over TI resulted in a change of ownership of TI's property for purposes of section 64(c). ■■ ■■ The fundamental requirement for a change in ownership under the section is the obtaining of *control* of the corporation that owns the property subject to reassessment, whether that control is obtained directly or indirectly.[6] The purchase of stock is the means by which the control must be secured, but, as we shall see, this does not, and in the context of the section cannot, mean that the stock purchased must be the stock of the corporation over which indirect control is obtained.

TI's primary assertion is just that: it urges the words "through the purchase or transfer of corporate stock" in section 64(c) refer to the purchase or transfer of the stock of the corporation that owns the property in issue, so that the section requires TI's own stock must have been purchased by Southern Pacific in order to result in a change of ownership under the section.

The problem with this contention is that it conflicts with the language of section 64(c) and has the effect of reading out of the section the reference to section 25105, which provides that the term "control" includes indirect control.

Section 64(c) specifies two means by which a change of ownership may occur. The first is if one corporation, by purchasing stock, obtains direct control of another which owns the property allegedly subject to reassessment. In the present case this would have occurred if Southern Pacific had purchased the stock of TI. The second means by which a change of ownership may occur under the section is if one corporation obtains indirect control of the corporation which owns the property in question. (A change of ownership occurs "When a corporation . . . obtains [indirect] control . . . in any corporation . . . through the purchase or transfer . . . of corporate stock.") The most obvious way in which one corporation obtains indirect control of another by the purchase or transfer of stock is to acquire, through purchase or transfer, a majority of the shares of a corporation that

---

[6]This construction of section 64(c) as making control of another corporation the touchstone of a change of ownership is supported by subdivison (d), which provides in part that "A transfer of shares . . . which results in a change in control of a corporation . . . is subject to reappraisal as provided in subdivision (c) . . . ."

owns a majority of the stock of the subsidiary corporation. This occurred here when Southern Pacific purchased all the stock of Ticor, which in turn owns all the stock of TI. Requiring Southern Pacific to purchase TI's stock in order to accomplish a change of ownership of TI's property under section 64(c), as TI contends, would eliminate the provision that a stock purchase resulting in indirect control of the corporation that owns the property constitutes a change of ownership of the property of the corporation controlled. Plaintiff's interpretation simply reads section 25105 out of section 64(c).

There is no merit in TI's claim that the words "purchase or transfer" of stock would be rendered surplusage if section 64(c) is interpreted to apply to the transaction involved here. Our construction of the section gives full meaning to the words quoted as referring to a purchase or transfer of the stock of a corporation (here Ticor) that results in indirect control of the corporation that owns the property in question, i.e., TI.

Nor do the concluding words of the section provide support for TI's position. The reference to the corporation "in which the controlling interest is obtained" does not denote the corporation in which the stock is purchased, but rather, the corporation in which the indirect (or direct) controlling interest is obtained. If the provision that "indirect" control constitutes a change in ownership is to be accorded its ordinary meaning, then the purchase of the stock of the corporation that owns the property cannot be a requirement for a change of ownership.

TI asserts that the use of the singular form in section 64(c) supports its interpretation. The section provides that "control" obtained "in any corporation" through the transfer of stock "shall be a change of ownership of property owned by *the* corporation . . . in which *the* controlling interest is obtained." (Italics added.) According to TI, because the words emphasized are stated in the singular, the section must be construed to mean that property owned by a subsidiary of the corporation whose stock has been purchased is not subject to reassessment. If the Legislature intended for subsidiaries to be included, goes the argument, it would have provided that when one corporation "obtains control . . . in any corporation*s* this would constitute a change of ownership of property owned by the corporation*s* in which the controlling interests [are] obtained."

The argument is totally without merit. TI simply ignores the command of the section that control in "any" corporation obtained through the purchase of stock constitutes a change of ownership. The singular word "the" is used to modify the words "corporation" and "controlling interest" for grammatical consistency with the term "any." Statutes often use the word "any" to

designate all those referred to;[7] it is perfectly plain from the structure of section 64(c) that the reference to "any" corporation means any corporation in which control is obtained indirectly (or directly) through the purchase of stock, most obviously a subsidiary of the corporation whose stock is purchased.[8]

TI relies also on the rule that where a statute "with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed." (*City of Port Hueneme* v. *City of Oxnard* (1959) 52 Cal.2d 385, 395 [341 P.2d 318].) It claims that if the Legislature had intended to apply section 64(c) to corporate subsidiaries, it would have done so explicitly, since it made clear in subdivision (b) of section 64 (albeit without the use of the term "subsidiaries") that subsidiaries were included within the terms of that subdivision. (See p. 88, *ante,* fn. 2.)[9]

This argument is also unconvincing. Although the Legislature did not use the terms "subsidiary" or "subsidiaries" in subdivision (c), it used the all-inclusive term "any" to refer to a corporation in which control is obtained, and it made it clear that indirect control of "any" corporation constitutes a change of ownership of the property owned by that corporation. This broad reference made it unnecessary to refer to subsidiaries or other specific types of corporate structures over which indirect control is obtained.

■ Even less persuasive is an argument of TI based on an amendment to subdivision (e) of section 64 in 1982, after the merger involved here. The subdivision provides that in order to "assist in the determination of whether a change of ownership has occurred under subdivisions (c) and (d)," the Franchise Tax Board shall include a question in substantially the following form on corporate returns: "If the corporation . . . owns real property in California, has cumulatively more than 50 percent of the voting stock . . . (1) been transferred by the corporation . . . since March 1, 1975, or (2) been acquired by another legal entity or person during the year?" If this question is answered in the affirmative, then the corporation must furnish the identity of the entity and of the stock transferees to the board.

---

[7] The point is too obvious to require extended elaboration. (See, e.g., §§ 65, 70, subd. (a).) The Penal Code contains hundreds of statutes defining a crime by prohibiting acts by "any person." (E.g., Pen. Code, §§ 337b, 337c, 337d, 337h, 337.4, 337.7.)

[8] TI's reliance on the use of the singular in section 480.1 is also unavailing, for the reason noted above. The section provides that "Whenever there is a change in control of *any* corporation . . . as defined in subdivision (c) of section 64, a signed change in ownership statement . . . shall be filed . . . . The statement shall list all counties in which *the* corporation . . . owns real property . . . . (b) . . . The information shall include, but not be limited to, a description of the property owned by *the* corporation . . . ." (Italics added.)

[9] Subdivision (b) of section 64 provides that the transfer of property among members of an affiliated group of corporations shall not constitute a change of ownership.

We agree with defendants that this amendment does not favor TI's construction of section 64(c). The question embodied in the amendment is designed not to state the circumstances under which a reassessment should occur, but to assist the appropriate authorities to determine whether a change in ownership has occurred by alerting them to stock purchases that might lead to reassessment of real property. If the taxpayer answers in the affirmative, the board would inspect the corporation's records to ascertain whether "a change in control . . . as defined in subdivision (c) of Section 64 has occurred." (§ 480.1, subd. (a).)

■■■ Although, in our view, the language used in section 64(c) is not ambiguous, the intent of the Legislature is the end and aim of all statutory construction (*People* v. *Belton* (1979) 23 Cal.3d 516, 526 [153 Cal.Rptr. 195, 591 P.2d 485]; *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322]; *County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526]); if the Legislature did not mean to apply section 64(c) to the transaction involved here, then we would necessarily find in TI's favor.

■ What did the Legislature intend by excepting the transfers designated in section 64(c) from the general rule (set forth in subdivision (a) of the section) that the purchase of stock is not deemed to be a transfer of the real property owned by a corporation? Defendants rely on a report issued by the Assembly Revenue and Taxation Committee which set forth the purpose of section 64(c) as follows: "This provision was enacted out of a concern that, given the lower turnover rate of corporate property, mergers or other transfer of majority controlling ownership should result in a reappraisal of the corporation's property—an effort to maintain some parity with the increasing relative tax burden of residential property statewide, due to the more rapid turnover of homes. It was also a trade-off for exempting transfers among 100% wholly-owned corporations." (1 Assem. Rev. & Tax. Com. Rep. on Property Tax Assessment (Oct. 29, 1979) p. 27.)

TI challenges the value of this report as an indication of the Legislature's intent since it was issued several months after the enactment of section 64(c). But no other reasons for the enactment of the section have been suggested. In our view, the equalization of the tax burden between individual and corporate purchasers of real property is an obvious purpose of the provision. Proposition 13, while directing reassessment of property upon a "change in ownership," did not define that phrase. The Legislature, in supplying a definition, recognized that it would be patently unfair to require the ordinary homeowner, who cannot avoid reassessment in purchasing property by placing title in the name of a corporate subsidiary, to bear the higher tax burden which would result from allowing corporations to avoid

reassessment by such means. As the court observed in *Sav-on, supra,* 190 Cal.App.3d 1611, 1622, under the construction urged by the taxpayer in that case, a corporation could avoid reassessment "by a simple step transaction involving the creation of a wholly owned subsidiary for the purpose of holding title to corporate realty."

TI and amicus curiae, the Institute of Property Taxation, claim that there is little danger of tax avoidance by corporations under the interpretation of the statute suggested by TI because the creation of a wholly owned subsidiary for the purpose of avoiding increased property taxes might result in undesirable consequences, such as adverse tax effects and operational burdens. It is impossible to determine whether such disadvantages would outweigh the tax savings to a corporation which would result if TI's interpretation of section 64(c) were accepted. In any event, whether the tax savings resulting from avoidance of reassessment of the property owned by a corporation's subsidiary arise from the formation of a subsidiary for the express purpose of holding title to realty, or whether, as here, the ownership of the property by the subsidiary preceded the change in control of the subsidiary, the result is the same: the homeowner, under the interpretation of section 64(c) advocated by TI, would be required to pay a disproportionate share of property taxes, as described in the report of the Assembly Revenue and Taxation Committee referred to above. We agree with the observation of the court in *Sav-on* that "If the Legislature had not clarified the phrase 'change of ownership' as it did, corporations might have enjoyed an unjustifiable and unintended advantage over individuals in the buying and selling of real estate. Plaintiffs' real complaint is that they have *not* received special treatment. They have only been treated equally and must, like individuals who acquire control of real estate, undergo a reassessment . . . ." (190 Cal.App.3d 1611 at pp. 1624-1625.)

In construing the terms of a statute we resort to the legislative history of the measure only if its terms are ambiguous. (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744]; *People* v. *Boyd* (1979) 24 Cal.3d 285, 294 [155 Cal.Rptr. 367, 594 P.2d 484].) From what we have said above, it is evident that in our view section 64(c) clearly requires the reassessment of property owned by a subsidiary under the circumstances presented here.

Although we are not required to do so, we consider TI's assertion that the history of the section demonstrates that the Legislature intended a different construction. In 1980, an amendment to section 64(c) was proposed that would have specifically included corporate subsidiaries within section 64(c). The amendment was not adopted. (Sen. Bill No. 1260 (1979-1980 Reg. Sess.).) The circumstances leading to the failure to enact the

amendment are not clear. Defendants claim that the amendment was withdrawn by the author of the bill after he received a letter from the California Taxpayers' Association asking for its deletion. ■ Whether or not this is so, the failure of the Legislature to amend an existing statute is inconclusive and has little interpretive value. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d 1379, 1396; *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 735, fn. 7 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161]; *Burgess* v. *Board of Education* (1974) 41 Cal.App.3d 571, 580-581 [116 Cal.Rptr. 183]; *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 57-58 [69 Cal.Rptr. 480]. ■ As the *Sav-on* decision observed, the Legislature may have objected to other portions of the bill, which contained numerous other provisions, or it may have determined that further clarification of the status of subsidiaries was unnecessary. (*Sav-on, supra,* 190 Cal.App.3d 1611 at pp. 1622-1623.) We do not have a situation in which the Legislature rejected a provision expressly designed to overrule a judicial decision. So far as we are aware, in 1980, the year the amendment was introduced, no court had considered the issue involved in the case at bar, and the board had taken a position regarding the meaning of section 64(c) consistent with the construction we adopt in this opinion.

■ Another argument made by TI is that the Legislature intended the term "change of ownership" in section 64(c) to mean the right to possess and use property to the exclusion of others. In this connection, it relies on cases holding that a shareholder does not have the right to possess or occupy corporate property because the corporation has a personality distinct from its shareholders (*Miller* v. *McColgan* (1941) 17 Cal.2d 432, 436 [110 P.2d 419, 134 A.L.R. 1424]), and that the transfer of a controlling interest in the stock of a corporation does not transfer the property of the corporation (*Bank of Visalia* v. *Smith* (1905) 146 Cal. 398, 403 [81 P. 542]).

We have no quarrel with the foregoing principles. But we disagree with the conclusion TI draws from them, i.e., that a shareholder in a corporation that controls a subsidiary must have the exclusive right to occupy the property owned by the subsidiary in order to trigger reassessment under section 64(c). As we emphasize repeatedly above, the touchstone of a change of ownership under section 64(c) is control of the corporation that owns the property subject to reassessment; it is not the right to occupy the property or to take possession of it. If the right of occupancy and possession were determinative of a change of ownership pursuant to the section, reassessment would not have been proper even if Southern Pacific had directly

purchased TI's shares since Southern Pacific would not as a shareholder have such rights in property owned by TI.[10]

Amicus curiae Institute of Property Taxation asserts that various administrative problems would arise in applying section 64(c) if it is interpreted to require reassessment of property owned by a corporate subsidiary, and that such difficulties demonstrate that the Legislature did not intend to adopt defendants' reading of the statute. Amicus posits a series of complicated transactions in corporate stock and urges that it would be difficult to determine in these situations whether one corporation has obtained control over another. Admittedly, the transaction in the present case was not complex, and there will be situations in which the issue of control of a corporate subsidiary will be more difficult to ascertain than it is here. Nevertheless, as defendants point out, it is the responsibility of the State Board of Equalization, the county boards, assessors, and sometimes the courts, to apply the terms of the statute to whatever circumstances may arise. There is not the remotest suggestion that the Legislature was even aware of the intricate examples of corporate reorganization propounded by amicus, much less that it intended to except property owned by corporate subsidiaries from the definition of a change of ownership under section 64(c) in order to avoid difficulties of interpretation which might arise if such property was subject to reassessment.

■ Finally, we decline to consider TI's assertion that section 64(c) is unconstitutional if it is interpreted to apply to TI's property. TI argued the constitutional issue to both the trial court and the Court of Appeal. Neither court reached the question since both construed the language of the section in TI's favor. In its answer to defendants' petition for review before this court, TI expressly waived consideration of the question whether section 64(c) is constitutional if its terms are construed to encompass the transaction involved here.[11] TI attempts to resurrect the question in its answering

---

[10] TI also urges us to consider an analysis of Assembly Bill No. 1488 (as amended June 28, 1979), issued by the Assembly Office of Research. The bill provided that a change of ownership included the transfer of stock of a corporation with legal title to real property which transfers "the exclusive right to occupancy and possession." This provision appears to have been adopted by the Legislature only with reference to cooperative housing corporations. Section 61 provides that "change in ownership . . . includes, but is not limited to . . . (h) [t]he transfer of stock of a cooperative housing corporation, vested with legal title to real property which conveys to the transferee the exclusive right to occupancy and possession of . . . property . . . ." Even if this provision applied to all corporate transfers, however, it would not aid TI's position because section 61 by its own terms does not represent all changes which could be characterized as a "change of ownership."

[11] The answer declares: "Neither is this a case which raises issues of constitutional dimensions. Although TI . . . raised the constitutionality of the statute in its crossappeal, it did not raise that issue in a petition for rehearing or by cross-petition for review. There is no constitu-

brief on the merits, claiming that the constitutional question is "fairly included" in the issues raised by defendants' petition for review (Cal. Rules of Court, rule 29.3(c)). This assertion must be rejected. The petition for review was confined to the question whether section 64(c) encompasses subsidiaries, and TI not only failed to raise additional issues in its answer (Cal. Rules of Court, rule 28(e)(5)), but it specifically renounced, as a question before this court, the constitutionality of section 64(c).

The judgment of the Court of Appeal is reversed with directions to order the trial court to enter judgment consistent with this opinion.

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Klein (Joan Dempsey), J.,* concurred.

The petition of plaintiff and appellant for a rehearing was denied April 5, 1989. Kaufman, J., did not participate therein.

---

tional issue before this court. The only issue is the application of section 64(c) to the specific facts of this case."

*Presiding Justice, Court of Appeal, Second Appellate District, Division Three, assigned by the Chairperson of the Judicial Council.