[No. D007716. Fourth Dist., Div. One. Apr. 17, 1989.]

PUEBLOS DEL RIO SOUTH et al., Plaintiffs and Appellants, v. CITY OF SAN DIEGO et al., Defendants and Respondents.

## COUNSEL

Shenas, Shaw & Spievak, George P. Shenas and Douglas S. Waggaman for Plaintiffs and Appellants.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace and Lewis P. Zollinger, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**HUFFMAN, J.**—On this appeal, we enter the fascinating world of real property reassessments after the passage of Proposition 13[1] to determine whether a corporate reorganization, exempt from state and federal income taxation, results in a "change of ownership" under the Revenue and Taxation Code thereby triggering reassessment of the real property transferred.

---

[1] Proposition 13, the Jarvis-Gann Amendment, was added to the California Constitution as article XIII A, by vote of the People on June 6, 1978. Section 1 of article XIII A provides in relevant part: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property." Section 2 of article XIII A provides in relevant part: "(a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a *change in ownership has occurred after the 1975 assessment.*" (Italics added.)

Revenue and Taxation Code section 64[2] was enacted as part of the legislative effort to interpret when a change of ownership has occurred under Proposition 13. (*Sav-on Drugs, Inc.* v. *County of Orange* (1987) 190 Cal.App.3d 1611, 1617 [236 Cal.Rptr. 100].) Subdivision (a) provides the general rule that, with certain stated specific exceptions, the purchase or transfer of corporate stock is not a transfer of the property of the corporation.[3] Unless one of the exceptions to this rule applies, a transfer of shares of stock does not result in reassessment of a corporation's property under Proposition 13.

Subdivision (b) of section 64 also provides that: "Any corporate reorganization, *where all of the corporations involved are members of an affiliated group,* and which qualifies as a reorganization under Section 368 of the United States Internal Revenue Code [26 U.S.C. § 368] and which is accepted as a nontaxable event by similar California statutes, or any transfer of real property among members of an affiliated group shall not be a change of ownership."[4] (Italics added.)

---

[2] Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code and its subparts (omitting repetition of the word "subdivision"), except in the case of article XIII A which is always a reference to that provision of the California Constitution.

[3] At the time of the reorganization here, section 64(a) stated: "Except as provided in subdivision (h) of Section 61 and subdivisions (c) and (d) of this section, the purchase or transfer of ownership interests in legal entities, such as corporate stock or partnership interests, shall not be deemed to constitute a transfer of the real property of the legal entity."

Section 61(h) concerns the transfer of stock in cooperative housing corporations.

Section 64(c) provides: "When a corporation, partnership, other legal entity or any other person obtains control, as defined in Section 25105, in any corporation, or obtains a majority ownership interest in any partnership or other legal entity through the purchase or transfer of corporate stock, partnership interest, or ownership interest in other legal entities, such purchase or transfer of such stock or other interest shall be a change of ownership of property owned by the corporation, partnership, or other legal entity in which the controlling interest is obtained."

Section 25105 recites: "Direct or indirect ownership or control of more than 50 percent of the voting stock of the taxpayer shall constitute ownership or control for the purposes of this article."

Subdivision (d) to section 64 only pertains to the transfer of more than 50 percent of the voting stock of an entity by its "original coowners" in situations where the formation of the entity was excluded from change in ownership by paragraph (2) of subdivision (a) of section 62. Section 62(a)(2) excludes those transfers "between an individual or individuals and a legal entity or between legal entities . . . which [result] solely in a change in the method of holding title to the real property and in which proportional ownership interests of the tranferors and transferees . . . in each and every piece of real property transferred, remain the same *after* the transfer." (Italics added.) Section 64(d) concludes, "A transfer of shares or other ownership interests which results in a change in control of a corporation, partnership, or any other legal entity is subject to reappraisal as provided in subdivision (c) rather than this subdivision."

[4] Section 64(b) further provides: "The taxpayer shall furnish proof, under penalty of perjury, to the assessor that the transfer meets the requirements of this subdivision. [¶]For purposes of this subdivision 'affiliated group' means one or more chains of corporations connected through stock ownership with a common parent corporation if: [¶](1) One hundred

We are concerned with the application of section 64(b) and the interplay between it and one of the exceptions to section 64(a). The questions posed are whether section 64(b) requires members of a transaction be affiliated *after* the reorganization as well as before and during the transaction in order to qualify as a "reorganization" under that subdivision and whether such qualified "reorganization" precludes application of the specific exception under section 64(c), which concerns the transfer or sale of controlling interests in a corporate entity.

## FACTUAL AND PROCEDURAL BACKGROUND

After a two-step corporate reorganization, the San Diego County Assessor reassessed the value of 28 parcels of land which were transferred from a parent corporation to an entity which no longer had any affiliation with the parent corporation and increased the property taxes due the City and County of San Diego. Pueblos del Rio South (Pueblos) and River Run Apartments (River), owners of the reassessed parcels,[5] unsuccessfully challenged this increase in property taxes before the assessment appeals board (the Board) and brought suit against the County and City of San Diego for refunds of ad valorem property taxes paid under protest. The city joined in the county's pleadings and papers and stipulated to being bound by any final court determination.

The case was submitted to the court for decision based on the following stipulated facts: Pueblos and River are California limited partnerships. Before December 1, 1983, Lion Property Corporation (Lion) was the general partner of Pueblos and owned 80 percent interest in Pueblos which in turn owned the subject 28 parcels of real property. Lion was a California corporation. Its outstanding stock was owned equally by Douglas O. Allred (Allred) and Donald F. Sammis (Sammis).

On December 1, 1983, Lion effected a "D" reorganization pursuant to Internal Revenue Code (IRC) section 368(a)(1)(D)[6] and Revenue and

---

percent of the voting stock, exclusive of any share owned by directors, of each of the corporations, except the parent corporation, is owned by one or more of the other corporations; and [¶](2) The common parent corporation owns, directly, 100 percent of the voting stock, exclusive of any shares owned by directors, of at least one of the other corporations."

[5] At the time of the reorganization, Pueblos owned all 28 parcels of land subject to the increase in property taxes. On September 13, 1985, Pueblos sold six of the parcels to its affiliate River, which then joined Pueblos in opposing the reassessment.

[6] IRC section 368(a)(1)(D) provides: "(a) Reorganization—[¶](1) In general—For purposes of parts I and II and this part, the term 'reorganization' means . . . (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securi-

Taxation Code section 23251. The reorganization involved the transfer of one-half of Lion's assets to its previously existing wholly owned subsidiary, Douglas Allred Company (DAC). Among the assets transferred from Lion to DAC was Lion's entire 80 percent general partnership interest in Pueblos. Immediately after this transfer, the DAC stock held by Lion was distributed to Allred in exchange for all of Allred's stock in Lion.

The San Diego County Assessor viewed this reorganization as a change in ownership of the parcels of real property owned by Pueblos, reassessed the value of the parcels, and sent out supplemental tax bills for the 1984-1985 tax year for those parcels.

In September 1985 Pueblos transferred to River six of the parcels, and River has been the sole owner of those parcels since that time.

Pueblos and River paid supplemental taxes for the 1984-1985 tax year (Pueblos paid $69,886.26 and River paid $15,631.48). All of these sums were attributable to the increased valuation of the parcels as a result of the alleged change of ownership. Thereafter, both filed applications for refunds of the supplemental property taxes already paid. The Board denied Pueblos's application for equalization/claim and made findings and conclusions concerning its denial. River's claim was subsequently denied in writing by the county.

Pueblos and River paid supplemental taxes for tax year 1985-1986 and again submitted claims for refunds. Pueblos paid $124,308.70 ($75,011.76 was attributable to the increased valuation of the parcels as a result of the alleged change in ownership) and River paid $27,423 ($15,669.90 was attributable to the increased valuation due to the alleged change in ownership). These claims were also denied.

No part of the property taxes for which Pueblos and River sought refunds was refunded by the city or county.

Pueblos and River then challenged the reassessments in the trial court. Based upon the undisputed facts, the parties presented the trial court with the question of whether Lion's reorganization resulted in a change of ownership of the Pueblos and River parcels under section 64(b). They specifically asked the court to determine whether that section requires the parties to a reorganization to be members of an affiliated group *after* the reorganization. The court so found.

---

ties of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356." The transaction qualified under IRC section 355.

■ On appeal, Pueblos and River renew their position section 64(b) does not require parties to a reorganization to remain affiliated after the reorganization in order to escape a change in ownership under the Revenue and Taxation Code mandating reassessment after Proposition 13; they therefore ask us to reverse the trial court's determination. ■ As the matter below was submitted on stipulated facts, the trial court was presented with purely legal questions and its statement of decision is not binding on us. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) We are thus free to draw our own conclusions of law from the undisputed facts. (*Jongepier* v. *Lopez* (1983) 142 Cal.App.3d 535, 538 [191 Cal.Rptr. 131].)

## DISCUSSION

### I

■ Preliminarily, we note it is uncontested the transfer of real property here qualified as part of a tax-free reorganization for income tax purposes under the Internal Revenue Code (§ 368(a)(1)(D)) and similar California statute (§ 23251). However, as far as section 64(b)'s requirement the reorganization be among "members of an affiliated group," it was, and is, conceded that while the members were affiliated before and during the reorganization, they were not affiliated *after* the transaction. Because the end result of the reorganization was that Lion transferred to DAC its 80 percent controlling interest in Pueblos and all ties between the parent Lion and its formerly wholly owned subsidiary DAC were severed, both the Board and the trial court found section 64(c) applicable in this factual situation rather than section 64(b).

Pueblos and River admit DAC did obtain majority ownership interest in Pueblos after the transfer and concede that if section 64(c) applies to the transaction there was a change of ownership triggering reassessment. They assert, however, section 64(b) rather than 64(c) prevails in this case.

### II

To resolve this matter, we find assistance in the recent Supreme Court case *Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d 84 [255 Cal.Rptr. 670, 767 P.2d 1148], which analyzed the applicability of section 64(c) to transactions involving changes in controlling interests of subsidiaries, and in *Sav-on Drugs, Inc.* v. *County of Orange, supra,* 190 Cal.App.3d 1611, which reviewed the interplay of and legislative history behind sections 64(b) and 64(c).

As the court noted in *Sav-on Drugs, Inc., supra,* 190 Cal.App.3d at pages 1617-1618: "In section 64 the Legislature has adopted a definition of 'change of ownership' for reassessment purposes that includes . . . outright sale of either the land or the company to a stranger, while exempting . . . a mere change in the *form* of ownership or corporate organization. It rather obviously determined reassessments may not be avoided under article XIII A via the simple expedient of disguising transfers of realty by means of selling all or a majority of the stock in real estate holding companies. In other words, the Legislature has determined article XIII A was meant to apply in the case of 'true' changes in ownership but not 'paper' ones." (*Ibid.*)

We thus review *Sav-on Drugs, Inc.* and *Title Ins. & Trust Co.* to gain insight into whether there was a true change of ownership in this case and not a mere paper change which would preclude reassessment under Proposition 13.

### A

In *Sav-on Drugs, Inc., supra,* 190 Cal.App.3d 1611, there arose the question of whether subdivision (b) or (c) of section 64 applied to the reorganization involved. The entities in *Sav-on* were affiliated after a two-step transaction and the only issue presented was whether the affiliation must also exist before the transaction. In determining affiliation must exist before the transaction, the court in *Sav-on Drugs, Inc.* toured the "legal minefield" deployed by the Legislature to express the electorate's intention in enacting Proposition 13, and held "it is clear the Legislature understood Proposition 13 to mean a reassessment should be permitted when, using control of the entity as its touchstone, a true change in ownership occurs (subd. (c)), but not otherwise (subd. (b))." (*Id.* at p. 1620.)

This interpretation was supported by a review of the plain language of the statute and its legislative history. The court in *Sav-on Drugs, Inc.* stated: "After the passage of Proposition 13, the Speaker of the Assembly created a Task Force on Property Tax Administration to assist the Legislature in implementing article XIII A. The Task Force report was published on January 22, 1979.

"The Task Force suggested the amendment should be construed on the basis of the traditional 'separate entity' theory, i.e., the notion found in our general law that corporations, partnerships, joint ventures, and associations have an identity apart from that of the owners. Several reasons were given: (1) Shareholders and partners have no individual possessory rights in the entity's real property. (2) Any other method would present serious prob-

lems of administration and enforcement. And (3) the unpredictable nature of potential ripple effects of disregarding the general law on the subject presented an unknowable risk.

"The Legislature generally followed the Task Force recommendations but not in [the area of corporate reorganizations.] A report of the Assembly's Revenue and Taxation Committee stated, 'Transfers *between* different legal entities DOES [*sic*] constitute a change in ownership, however. For example, a transfer of property between two non-affiliated corporations, a partnership and a corporation, or a partnership and an individual are all changes in ownership. This was termed by the Task Force as the "separate entity theory," in which the general laws of the state endowing corporations, partnerships, joint ventures, associations and so forth with an identity separate from its owners is respected. To tax transactions among entities and individuals was considered to be quite important in order to head off two-step transactions of property from one person to another via a corporation, (i.e., A incorporates his home or business, then sells 100% of stock in corporation to B, who may then dissolve the corporation and own the home or business), which would otherwise escape reappraisal. [¶] The majority-takeover-of-corporate-stock provision deviates from this general theory, and represents an "ultimate control" rationale. This provision was enacted out of concern that, given the lower turnover rate of corporate property, mergers or other transfer of majority controlling ownership should result in a reappraisal of the corporation's property—an effort to maintain some parity with the increasing relative tax burden of residential property statewide, due to the more rapid turnover of homes. It was also a trade-off for exempting transfers among 100% wholly owned corporations.' (1 Assem. Rev. & Tax Com. Rep. on Property Tax Assessment (Oct. 29, 1979) p. 27.)" (*Sav-on Drugs, Inc.* v. *County of Orange, supra,* 190 Cal.App.3d 1611, 1620-1621.)

In *Sav-on Drugs, Inc.,* the court viewed the text of this committee report, together with the language of sections 64(b) and 64(c), construed together in a "common sense manner," and an advisory letter from the State Board of Equalization, which stated " 'the organizations involved must be an affiliated group *before* the merger takes place; and, becoming an affiliated group cannot be just one step in the reorganization' " (190 Cal.App.3d at p. 1620), and held such reflected the Legislature's intent a merger such as the one there was not a reorganization within the meaning of section 64(b) because the entities were not affiliated before the transfers of control. (*Id.* at pp. 1618-1621.)

B

In *Title Ins. & Trust Co.,* our Supreme Court held "section 64(c) applies, so as to require reassessment, where . . . one corporation purchases all the

shares of stock of another, and the real property allegedly subject to reassessment is owned not by the corporation whose stock has been purchased but by a wholly owned subsidiary of that corporation." (*Title Ins. & Trust Co., supra,* 48 Cal.3d 84 at pp. 89-90.) While *Title Ins. & Trust Co.* did not concern the interplay between sections 64(c) and 64(b), the court's analysis of the applicability of section 64(c) to the transaction involved in that case is instructive.

There, Title Insurance & Trust Company had argued section 64(c) did not apply to its transaction because that subdivision did not include the word "subsidiaries" and only referred to corporations. (*Title Ins. & Trust Co., supra,* 48 Cal.3d 84 at p. 93.) The court rejected this argument, looking first at the language used in that subdivision, giving the words their meaning in ordinary usage, and construing them in context with the provisions relating to the same subject matter. (*Ibid.*) In finding the subdivision unambiguous and that it applied to subsidiaries as well as corporations, the Supreme Court stated: "Although the Legislature did not use the terms 'subsidiary' or 'subsidiaries' in subdivision (c), it used the all-inclusive term 'any' to refer to a corporation in which control is obtained, and it made it clear that indirect control of 'any' corporation constitutes a change of ownership of the property owned by that corporation. This broad reference made it unnecessary to refer to subsidiaries or other specific types of corporate structures over which indirect control is obtained." (*Id.* at p. 94.)

Without being required to do so, the Supreme Court then reviewed the Legislature's intent, as the "end and aim of all statutory construction" (48 Cal.3d at p. 94) and discussed the legislative history behind the enactment of section 64(c). (*Id.* at pp. 96-97.) Relying heavily on *Sav-on Drugs, Inc., supra,* 190 Cal.App.3d 1611[7] and the Assembly's Revenue and Taxation Committee Report on Property Tax Assessment dated October 29, 1979, the court gave its view that: "[T]he equalization of the tax burden between individual and corporate purchases of real property is an obvious purpose of the provision. Proposition 13, while directing reassessment of property upon a 'change in ownership,' did not define that phrase. The Legislature, in supplying a definition, recognized that it would be patently unfair to require the ordinary homeowner, who cannot avoid reassessment in purchasing property by placing title in the name of a corporate subsidiary, to bear the higher tax burden which would result from allowing

---

[7] The Supreme Court had earlier granted review of *Title Ins. & Trust Co., supra,* 48 Cal.3d at page 91, footnote 4, retransferring it to the Fourth District, Division Two, Court of Appeal, for reconsideration in light of *Sav-on Drugs, Inc., supra,* 190 Cal.3d 1611. When that court distinguished *Sav-on* and reaffirmed its prior decision, the Supreme Court again granted review and reversed the Court of Appeal decision. (See *Title Ins. & Trust Co., supra,* 48 Cal.3d at p. 91, fn. 4.)

corporations to avoid reassessment by such means. As the court observed in *Sav-on, supra,* 190 Cal.App.3d 1611, 1622, under the construction urged by the taxpayer in that case, a corporation could avoid reassessment 'by a simple step transaction involving the creation of a wholly owned subsidiary for the purpose of holding title to corporate realty'. . . . [¶] We agree with the observation of the court in *Sav-on* that 'If the Legislature had not clarified the phrase "change of ownership" as it did, corporations might have enjoyed an unjustifiable and unintended advantage over individuals in the buying and selling of real estate. Plaintiffs' real complaint is that they have *not* received special treatment. They have only been treated equally and must, like individuals who acquire control of real estate, undergo a reassessment . . . .' [Citation.]" (*Title Ins. & Trust Co., supra,* 48 Cal.3d at pp. 95-96.)

## C

While we are confronted here with the issue of corporate affiliation *after* a reorganization rather than before, the rationale of *Sav-on Drugs, Inc.* and *Title Ins. & Trust Co.* appears to equally apply to this case. Here, the transaction was a two-step procedure which transferred ownership interests from Lion, a corporation, to its fully owned subsidiary DAC and then to Allred, an individual separate from the corporation. Lion originally owned the controlling partnership interest in Pueblos which owned the subject property. Lion exchanged its shares in DAC for Allred's shares in Lion to allow its two owner/shareholders, Sammis and Allred, to go their separate ways.

With this transaction, control of Lion went 100 percent to Sammis, a 50 percent increase in control, with similar control and increase in control of DAC going to Allred. Within the 100 percent going to Allred was the 80 percent interest in Pueblos and, consequently, majority control of the property in question.

As the Assembly report quoted in *Sav-on Drugs, Inc.* noted, the "ultimate control" rationale should cause reappraisals after transfers of real property when majority controlling ownership in a corporation changes. (*Sav-on Drugs, Inc., supra,* 190 Cal.App.3d at p. 1621.) Such a change occurred here and was so found by both the Board and the trial court. Thus both impliedly found section 64(c) applied here rather than section 64(b) and found a true change of ownership. We agree with these findings of the Board and trial court.

Following the analysis used by the court in *Sav-on* and the Supreme Court in *Title Ins. & Trust Co.,* we first note the plain language of section 64(b) sets out two situations where transactions among legal entities will not result in a change of ownership for purposes of reassessment: (1) a

corporate reorganization where *all of the corporations involved are members of an affiliated group and* the transaction qualifies as a reorganization under section 368 of the Internal Revenue Code *and* is accepted as a nontaxable event by similar California statutes; and (2) any transfer of real property among members of an affiliated group. Section 64(b)'s definition of an "affiliated group" requires, in effect, 100 percent control of the voting stock of at least one of the entities to be held, directly or indirectly, by a single common parent corporation. (See fn. 4, *ante,* at p. 896.)

Pueblos and River, as did the appellants in *Sav-on,* argue the definition in section 64(b) of what constitutes an "affiliated group" is ambiguous; thus, we must resolve the ambiguity in their favor. They further assert section 64(b) does not explicitly state that the affiliation must continue throughout the transaction to qualify it as a "reorganization" under that section. They contend such interpretation, that section 64(b) only provides an exclusion for legal entities affiliated both before and after a reorganization, would render the section completely redundant. As support for this argument, they point to section 62(a)(2)[8] which provides an exclusion for any transaction where there may be a change in the method of holding title but in which there is no change in the proportional beneficial ownership of the property in question. Not only do we think the language of section 64(b) is unambiguous, section 62 clearly does not make section 64(b) redundant.

■ Generally, in interpreting statutes levying taxes, a court "'may not extend [the statutory] provisions, by implication, beyond the clear import of the language used, nor enlarge upon their operation so as to embrace matters not specifically included.'" (*Cal. Motor etc. Co.* v. *State Bd. of Equal.* (1947) 31 Cal.2d 217, 223-224 [187 P.2d 745].) The court is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858.)

■ If the statute is clear, the "plain meaning" rule applies; the Legislature is presumed to have meant what it said, and the plain meaning of the language governs. (*Great Lakes Properties, Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244].) ■ All its provi-

[8] Section 62(a)(2) provides that a change in ownership shall not include: "Any transfer between an individual or individuals and a legal entity or between legal entities, such as a cotenancy to a partnership, a partnership to a corporation, or a trust to a cotenancy, which results solely in a change in the method of holding title to the real property and in which proportional ownership interests of the transferors and transferees, whether represented by stock, partnership interest, or otherwise, in each and every piece of real property transferred, remain the same after the transfer. The provisions of this paragraph shall not apply to transfers also excluded from change in ownership under the provisions of subdivision (b) of Section 64."

sions " 'are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice' " (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 487 [134 Cal.Rptr. 630, 556 P.2d 1081]), and "a specific provision should be construed with reference to the entire statutory system of which it is a part. . . ." (*Id.* at p. 489.) "When used in a statute [, words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].) "Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

■ Here, the ordinary commonsense meaning of the phrase "members of an affiliated group" in section 64(b) is one that includes affiliation from beginning until the end of the transaction to determine change in ownership for Proposition 13 purposes. That the Legislature did not use the terms before and after in section 64(b) does not make it ambiguous.

■ Generally speaking, "change" necessarily infers a comparison of something before and after an event in order to determine whether that something has been altered or is different; so also here. Only where the entities involved in a reorganization are affiliated after the transaction, as well as before the transaction, will there be no difference in or altered ownership. It is difficult to conceive of an analysis of property or interests transferred in a reorganization without considering affiliation of the entities after as well as before a transaction. Continuing affiliation is thus a yardstick for measuring whether entities qualify for the section 64(b) property tax exclusion.

This interpretation comports with the intent of the Legislature in enacting section 64 and its subdivisions as expressed in *Sav-on Drugs, Inc.* and *Title Ins & Trust Co.* (*Title Ins. & Trust Co., supra,* 48 Cal.3d at pp. 95-96; *Sav-on Drugs, Inc., supra,* 190 Cal.App.3d at pp. 1620-1621.)

■ Also, as stated by the Assembly's Revenue and Taxation Committee report discussing the implementation of Proposition 13: "The purpose of [section 64(b)] is to exclude those transfers made among subsidiaries directly or indirectly owned by the same parent corporation, and which, therefore, are essentially under the same ownership and control before the transfer as after." (1 Assem. Revenue & Tax Com. Rep. on Property Tax Assessment: Implementation of Proposition 13, Vol. 1 (October 29, 1979) p. 28.) ■ While not controlling, this contemporaneous and practical construction of section 64(b) by the committee whose duty it was to study

and determine the procedures to carry Proposition 13 into effect, given appropriate weight, further supports our interpretation. (*People* v. *McGee* (1977) 19 Cal.3d 948, 961 [140 Cal.Rptr. 657, 568 P.2d 382].)

Looking at the entire statutory scheme enacted to implement Proposition 13 (see 11 Lane, Cal. Practice (2d ed. 1987) State and Local Taxation, §§ 20, 21, 99, pp. 15-17, 83-86), transfers of property interests to, from or between legal entities are generally changes of ownership and transfers of ownership interests in the entity are not so treated. Exceptions to these general rules apply. Neither transfers of property among members of an "affiliated group" (§ 64(b)) nor transfers of property to legal entities or among individuals which produce no change in beneficial interests are treated as changes in ownership. (§ 62(a)(2); rule 462(j)(2)(B).)

What is treated as a change of ownership is the situation where any corporation, partnership, other legal entity or any person obtains direct or indirect ownership of more than 50 percent of the voting stock in a corporation, the total interest in both capital and profits of a partnership, or the total interest in any other legal entity. (§ 64(c).) The implementation statutes require any changes in entity control be reported to the State Board of Equalization. (§ 480.1.)

The State Board of Equalization has promulgated rules to assist in implementing Proposition 13 which track sections 61, 62, and 64, enacted by the Legislature. (Cal. Code Regs., tit. 18, § 462 et seq.) These rules describe transfers of property or interests as those which result in a change *after* the transfer whether considered for change in ownership reappraisal as to individuals or legal entities. (See rules 462(b)(2)(A)(iii), 462(c)(2)(A) and (D)(iii), 462(j)(2)(B), 462(m)(5).)

Moreover, section 62 and its subparts discuss the transfers of real property interests involving individuals as well as legal entities, while section 64 and subparts discuss the transfers of ownership interests in legal entities, except where the real property transfer is among members of an affiliated group. (§ 64(b).) As Pueblos and River note, section 62(a)(2) itself provides the provisions of that section "shall not apply to transfers also excluded from change of ownership under the provisions of subdivision (b) of section 64." In addition, section 64(b) does not require, as does section 62(a)(2), that the same interests be maintained after the transaction as before. Section 64(b) only requires the parent corporation to retain 100 percent of voting stock in one other corporation in the chain of corporations which own the other subsidiaries; i.e., section 64(b) only requires a common link after the transaction and not that all interests remain the same. Thus the existence of section 62 does not make section 64(b) redundant.

Having reviewed the statutory scheme and the language used in section 64, and specifically in section 64(b), in light of *Sav-on Drugs, Inc.* and *Title Ins. & Trust Co.,* we conclude section 64(b) unambiguously requires affiliation from the beginning until the end of the transaction in order to qualify as a "reorganization" excluded from reassessment under Proposition 13.

## D

In a last ditch attempt to undermine the interpretation that section 64(b) requires continuing affiliation, Pueblos and River rely upon a statement in an advisory letter sent out to assessors by the State Board of Equalization after section 64 was amended in 1982, which stated the amendment was consistent with the practice to include all IRC section 368 reorganizations in the exclusion.[9] Because the amendment to section 64(b) deleted the terms merger and consolidation, and because a divisive reorganization under IRC section 368 allows entities which were once affiliated to become separate unrelated entities while qualifying for tax-free treatment under the income tax provisions, Pueblos and River argue the Legislature must have intended the 1982 amendment to section 64(b) to include this type of reorganization; otherwise, they assert, the amendment would be meaningless as the old version included all other types of reorganizations. They argue the intent of the amendment was to broaden the application of section 64(b) beyond the acquisition type reorganizations represented by mergers and consolidations.

The same argument, however, was advanced in *Sav-on Drugs, Inc.* and refuted. (*Sav-on Drugs, Inc.* v. *County of Orange, supra,* 190 Cal.App.3d 1611, 1619.) The corporate merger or reorganization there also qualified under the federal and similar state income tax provisions as a tax-free transaction. Since affiliated entities as well as unaffiliated ones could accomplish mergers or consolidations, the court in *Sav-on Drugs, Inc.* did not ascribe the same significance to the amendment deleting those words as the plaintiffs there urged. (*Ibid.*) Nor do we now. When the Legislature amended section 64 in 1982, deleting the terms "merger and consolidation" from the text of subdivision (b), it kept those same terms in the title of section 64. Thus the significance of the deletion of those terms from the text of that section is inconclusive and has little interpretive value. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396 [241 Cal.Rptr. 67, 743 P.2d 1323].)

Further, both affiliated and nonaffiliated entities can accomplish the variety of reorganizations listed under the Internal Revenue Code to qualify for

[9]The February 18, 1983, letter specifically stated section 64(b) was amended by the deletion of the term "by merger or consolidation" for "clarification and is consistent with the administrative practice that all [IRC] Section 368 reorganizations qualify for the exclusion."

tax-free treatment. And, it should also be noted, section 64(b)'s definition of affiliated groups is more narrowly drawn than in the comparable federal income tax law, since it requires 100 percent control of the voting stock of the two entities to be held, directly or indirectly, by a single common parent corporation while the comparable federal rule only requires 80 percent of the voting stock and 80 percent of the number of non-voting shares. (IRC §§ 1502, 1504; 11 Lane, Cal. Practice (2d ed. 1988 supp.) State and Local Taxation, § 99, at pp. 15-16.) Thus, just because a merger may be found to be tax-exempt for one purpose or under one set of laws, does not necessarily mean it is tax-exempt for all purposes and under all other laws.

Moreover, an April 12, 1983, letter issued by the State Board of Equalization pointed out its earlier statement in the February 1983 letter was erroneous and cautioned only those corporate reorganizations which meet the criteria of section 64(b) qualify for exclusion. One specific factor of that section is that the organizations involved be affiliated. As did the letter in *Sav-on Drugs, Inc.,* this letter also reiterated the organizations must be an affiliated group before any merger. The fact it did not also state a group must be affiliated afterwards does not change our interpretation.

### CONCLUSION

Because the corporate reorganization here did not involve entities which were affiliated after the reorganization, the transaction did not fall under the narrow exclusion of section 64(b). Rather, a "change of ownership" occurred under section 64(c) which properly resulted in the reassessment of the real property transferred.

In light of this holding, we need not determine whether qualified reorganizations preclude application of the specific exception under section 64(c).

Judgment is affirmed. Respondents shall have costs on appeal.

Work, Acting P. J., concurred.

**FROEHLICH, J.,** Dissenting.—The majority concludes that any "D" type reorganization will result in reassessment of real property owned by the corporate entities involved in the reorganization. While the facts of the instant case are somewhat complicated, they are nevertheless typical of "D" reorganizations, the essentials of which are simple. Perhaps not coincidentally, a "D" reorganization is a "divisive" reorganization. As set forth in Internal Revenue Code section 368, it is one of the several types of changes in corporate structure or ownership deemed by the federal (and usually

state) government not to be sufficiently substantive as to warrant recognition for income tax purposes.

Simplifying the facts (more fully reported in the majority opinion), the real property in question was initially owned by a partnership, which in turn was owned by a corporation. The corporation was owned equally by Allred and Sammis. The "divisive" reorganization entered into by the parties resulted in division of their corporate entity and division of its assets. Allred wound up as sole owner of a corporation which held the real property. Hence, overlooking the interposition of corporate and other structures, Allred traded a half interest in total property for a whole interest in half the property. Put another way, it appears from the record that there was no change in values owned by Allred and Sammis—they simply divided what they owned, each taking half and now owning his half fully.

Everyone involved in the case has labored mightily over the interpretation of the relevant statute: Revenue and Taxation Code[1] section 64. As explained by the majority, reassessment of real property for tax purposes occurs whenever there is a "change of ownership." Section 64 deals with the problems confronted by changes in ownership of a corporation which owns real property. Generally, transfers of interests in partnerships or corporations which own realty do not result in a "change of ownership" of the realty unless a majority ownership changes hands. (§ 64(c).) The confusing section is section 64(b), which deals with changes in corporate ownership resulting from an Internal Revenue Code section 368 corporate reorganization. Section 64(b) provides that such changes will not be a "change of ownership" *provided* "all of the corporations involved are members of an affiliated group."

The term "affiliated group" is subject to technical definition, but for purposes of this case we need not examine its intricacies. Suffice it to say that "affiliated group" is a concept relating to common ownership or control of two or more corporations. There is no dispute in this case: Before the reorganization the corporations in question were commonly owned and were part of an "affiliated group." After the reorganization the corporation which wound up owning the realty was solely owned by Allred, and hence was not "affiliated" with the corporation Sammis ultimately owned.

Thus our issue is posed. When section 64(b) requires that the corporations involved in the reorganization be part of an "affiliated group," does it require affiliation *before* the reorganization, affiliation *after* the reorganiza-

---

[1] All statutory references are to the Revenue and Taxation Code unless otherwise specified. When referring to statutory subparts I omit repetition of the word "subdivision."

tion or affiliation both before and after the reorganization? A review of the careful majority opinion satisfies that there is no rule of statutory construction or legislative history which clearly answers this question. To provide an answer, therefore, the majority is required to look to the purposes and objectives of the law. The majority concludes that to come within section 64(b) the affiliation must be both before and after the reorganization. I would conclude that the affiliation need exist only *before* the reorganization, thus permitting "D" type reorganizations to come within the exemption from reassessment provided by section 64(b).

I reach this conclusion by analyzing the same authorities utilized by the majority. The first case to study is *Sav-on Drugs, Inc.* v. *County of Orange* (1987) 190 Cal.App.3d 1611 [236 Cal.Rptr. 100]. This was an example of a type "A" or "merger" reorganization. The reorganization came within Internal Revenue Code section 368 and the parallel state income tax provision, and hence the question of whether realty owned by the corporations was to be reassessed came down to whether the "affiliated group" test was met. As in our case, the status of affiliation was clear. After the reorganization the entities, having been merged, were obviously "affiliated." Before the merger, however, the entities, being owned by separate premerger interests, were not affiliated. The question in our case is whether *post* reorganization affiliation is required; in *Sav-on* the question was whether *pre* reorganization affiliation is required. The Court of Appeal ruled that pre-merger affiliation was required, and hence reassessment of the underlying realty was proper.

To reach its conclusion, the court analyzed the objectives of the Legislature. It found that the goal was to treat corporate transfers substantively the same as individual transfers. Corporations should not be accorded exemptions from reassessment of their realty simply because of the mode of ownership. While a mere change in the "form" of ownership or corporate organization should not give rise to reassessment, an actual transfer should not escape reassessment by a "simple expedient" of disguising the transfer by use of corporate structures. (190 Cal.App.3d at p. 1617.) The Legislature, the court found, intended that "a reassessment should be permitted when, using control of the entity as its touchstone, a true change in ownership occurs (subd. (c)), but not otherwise (subd. (b)) [referring to the subdivisions of § 64]." (*Id.* at p. 1620.)

The *Sav-on* court had little difficulty in resolving the issue when it examined the real "substance" of the transaction. Although the old owners of the realty remained in the reorganized corporation, they were now minority owners. (190 Cal.App.3d at p. 1618.) The "real" owners of the realty had in fact changed. This result could occur in a reorganization qualified under Internal Revenue Code section 368, but would not come within section

64(b) if the affiliation requirement were imposed *before* the reorganization. The *Sav-on* court did not touch our issue—whether affiliation is required *after* reorganization.

The other authority of interest is *Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d 84 [255 Cal.Rptr. 670, 767 P.2d 1148]. The real property subject to reassessment in this case was owned by Title Insurance & Trust Company. Title Insurance & Trust Company was a wholly owned subsidiary of Ticor. Southern Pacific, through purchase of stock and merger, acquired Ticor as a wholly owned subsidiary. The taxpayer's contention was that reassessment was improper because no change of ownership had occurred. In refuting this position the Supreme Court relied on what it found to be unambiguous provisions of section 64(c). The transfer of control of a corporation results in "change of ownership" when the change of control is either direct or indirect. (48 Cal.3d at p. 91.) While Title Insurance & Trust Company, the property-owning corporation, had not changed, and its parent Ticor remained its sole owner, the ownership of Ticor had been acquired by new majority owner Southern Pacific. Looking through the corporate entities, therefore, substantive ownership of a majority interest in the realty had been transferred. (*Id.* at p. 92.)

In analyzing the rationale of the statutory design, the court confirmed the *Sav-on* conclusion that an objective was to equalize the reassessment treatment of individuals and corporate entities, stating: "In our view, the equalization of the tax burden between individual and corporate purchasers of real property is an obvious purpose of [section 64(c)]. . . . The Legislature, . . . recognized that it would be patently unfair to require the ordinary homeowner, who cannot avoid reassessment in purchasing property by placing title in the name of a corporate subsidiary, to bear the higher tax burden which would result from allowing corporations to avoid reassessment by such means. As the court observed in *Sav-on, supra,* 190 Cal.App.3d 1611, 1622, under the construction urged by the taxpayer in that case, a corporation could avoid reassessment 'by a simple step transaction involving the creation of a wholly owned subsidiary for the purpose of holding title to corporate realty.'" (48 Cal.3d at pp. 95-96).

While the *Title Ins.* case sheds no light on the timing of the "affiliated group" requirement of section 64(b), it nevertheless provides guidance. The effort, we are told, should be to equalize insofar as possible the reassessment treatment of individuals and corporations. Instruction in this process, then, may come from a review of the provisions applicable to individuals which deal with situations most like the plight of Allred and Sammis. As will be remembered, Allred and Sammis were co-owners of realty. That the realty was owned through intervening corporate and limited partnership entities is

a matter, we are told by *Sav-on* and *Title Ins.*, which we should overlook. The "substance" of their ownership was as co-owners. Their objective was not to buy or sell each other's ownership, but to sever their relationship, each taking half of total ownership. This they did, and part of the moiety of assets allocated to the entity and transferred to Allred turned out to be real property.

What is the noncorporate exemple most similar to the above? I submit that it is co-ownership of realty by individuals. Looking to the Revenue and Taxation Code, we find that generally the division of ownership in realty by co-owning individuals does not result in reassessment. Section 62(a)(1) provides that the partition of a tenancy in common is not a "change in ownership." Section 63 exempts from "change of ownership" status various transfers between spouses. Section 65 exempts transfers into and out of joint tenancy so long as an "original transferor" remains vested in ownership. Putting these results in corporate jargon, a "D" reorganization of individual co-ownership of realty does not result in reassessment. It is not necessary, therefore, in order to equalize tax treatment of individuals and corporations, to subject "D" reorganizations of corporations uniformly to reassessment.

Our comparison of the individual to the corporate situation is, of course, not perfect. Co-ownership of land which is severed always results in subsequent ownership of land by the former co-owners, and in fact is the very land they previously owned in undivided interests. The situation would be similar where the sole asset of a corporation consisted of land. Should the prereorganized corporation own both realty and personalty, and should all the realty be transferred to one owner in a "D" reorganization, the comparison with the individual example would seem strained. We do not know, in the case of Allred and Sammis, what sort of assets Sammis received as his share of the corporation.

The thrust of this train of logic is that in applying the rationale of the *Sav-on* and *Title Ins.* cases, it is likely that they point to a conclusion favoring nonreassessment results for typical "D" reorganizations. There is no other identifiable policy to guide our construction of the statute. No one would contend, I presume, that ambiguity of a taxing statute should lead to the presumption of intention to tax. A very reasonable interpretation of the limiting condition of section 64(b)—that "all of the corporations involved [in the reorganization] are members of an affiliated group"—is that the time of measurement is at, and not after, reorganization. *Sav-on* reached the conclusion that absence of affiliation before the reorganization precluded applicability of the exemption. This result was required, however, to avoid creating a special assessment status for property owned by corporations.

The "D" type reorganization mirrors property severances by individuals who are exempt from reassessment. There is therefore no compulsion to read absent requirements into the statute in order to equalize corporate treatment with individual treatment. A reasonable practitioner, I suggest, would after due study of section 64(b) conclude that "D" reorganizations which qualify under Internal Revenue Code section 368 would be exempt from California property tax reassessment. I find no compelling reason to defeat this reasonable expectancy. I would therefore reverse the judgment of the trial court.

Appellants' petition for review by Supreme Court was denied June 29, 1989.