[No. B043176. Second Dist., Div. Four. Sept. 13, 1990.]

TWENTIETH CENTURY FOX FILM CORPORATION, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Hill, Wynne, Troop & Meisinger, Louis M. Meisinger, Robert M. Jason, Susan Westeen Novatt, Drew & Driscoll and Donald J. Drew for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, Halvor S. Melom and Albert Ramseyer, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**WOODS (A. M.), J.**—Twentieth Century Fox Film Corporation (Fox) appeals the unfavorable judgment in its action for a tax refund against the County and the City of Los Angeles (respondents).

This appeal involves the issue of whether the acquisition of one corporation by another corporation, specially created for that purpose, constitutes a change of ownership so as to require reassessment of real property owned by the acquired corporation when none of the investors in the acquiring corporation owned more than 50 percent of its stock. (Rev. & Tax. Code, §§ 64, subd. (c), 25105.)[1]

Prior to June 12, 1981, Fox was a publicly traded corporation engaged in a number of businesses primarily within the entertainment industry. Additionally, Fox and its wholly owned subsidiaries, Deluxe General, Incorporated (Deluxe), and Fox Realty Corporation, owned the real properties on which their businesses were situated.

In 1981, a group of investors decided to acquire Fox. The investors and their respective ownership interests were as follows: Richo Holdings, 50 percent; Marvin Davis, 10 percent; Patricia Davis Trust, 7.5 percent; Nancy Davis Trust, 7.5 percent; Gregg Davis Trust, 7.5 percent; Dana Davis Trust, 7.5 percent; and John Davis Trust, 10 percent.

Eschewing direct acquisition by themselves of Fox for logistical reasons, the investors formed three shell corporations solely for that purpose. These three corporations were TCF Holdings, Inc. (Holdings), TCF Intermediate Company, Inc. (Intermediate), and TCF Acquisitions, Inc. (Acquisitions). Intermediate was a wholly owned subsidiary of Holdings; Acquisitions was a wholly owned subsidiary of Intermediate.

On June 12, 1981, Acquisitions was merged into Fox. The outstanding shares of Fox were thus redeemed, and Fox became a wholly owned subsidiary of Intermediate. Acquisitions ceased to exist after the June 1981 transaction. In September 1981, Fox was merged into its parent corporation, Intermediate, which then changed its name to Fox.[2] The end result of these

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise noted.

[2] Fox refers to this transaction as a reverse triangular merger. Fox purports to find some significance in the form of this transaction, particularly the fact that Acquisitions merged with Fox rather than vice versa. The crucial point for the purposes of this appeal, however, is Fox's concession that, as a result of the transaction, Fox became a subsidiary of Intermediate.

two transactions was that the investors held all of Fox's stock through Holdings.

In June 1982, respondents notified Fox of the reassessment of real property owned by it and its subsidiary, Deluxe, as a result of the June 1981 transaction. Fox pursued its administrative remedies prior to filing this action in September 1987.[3] The court below rendered judgment in favor of respondents. This appeal ensued. We affirm.

## I.

Under article XIII A of the state Constitution, ad valorem taxes on real property are limited to one percent of full cash value (Cal. Const., art. XIII A, § 1, subd. (a)), except as to property that changed ownership after the 1975-1976 tax year which is subject to reassessment (*id.*, § 2, subd. (a)). The task of defining what constitutes change of ownership was left to the Legislature.

In pursuit of that end, the Legislature adopted section 64. Subdivision (a) provides in essence that, with certain exceptions, the purchase or transfer of corporate stock is not a transfer of property of the corporation. One such exception is provided by subdivision (c) of section 64: "When a corporation, partnership, other legal entity or any other person obtains control, as defined in Section 25105, in any corporation, or obtains a majority ownership interest in any partnership or other legal entity through the purchase or transfer of corporate stock, partnership interest, or ownership interests in other legal entities, such purchase or transfer of such stock or other interest shall be a change of ownership of property owned by the corporation, partnership, or legal entity in which the controlling interest is obtained."

Section 25105 provides: "Direct or indirect ownership or control of more than 50 percent of the voting stock of the taxpayer shall constitute ownership or control for the purposes of this article."

In enacting section 64, subdivision (c), the Legislature sought to avoid inequality between the tax burden imposed on residential property due to its rapid turnover rate and that borne by corporate property in view of its lower turnover rate. Thus, " 'mergers or other transfer of majority controlling ownership should result in a reappraisal of the corporation's property . . . .' " (*Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d 84, 95 [255 Cal.Rptr. 670, 767 P.2d 1148], quoting 1 Assem. Rev. &

---

[3] Respondent county's assessment appeals board declined to go forward with the appeal pending resolution by the courts of whether the June 1981 transaction constituted a change of ownership.

Tax. Com. Rep. on Property Tax Assessment (Oct. 29, 1979) p. 27.) "[T]he equalization of the tax burden between individual and corporate purchasers of real property is an obvious purpose of the provision." (*Title Ins. & Trust Co.* v. *County of Riverside, supra,* at p. 95.)

In the *Title Ins. & Trust Co.* decision, the Supreme Court also determined that the language of section 64, subdivision (c) was not ambiguous. ■ "The section provides, in essence, that if one corporation either directly or indirectly obtains control over another by the transfer or purchase of stock, a change of ownership occurs as to the real property owned by the corporation over which it has obtained direct or indirect control." (48 Cal.3d at pp. 91-92; accord *Pueblos Del Rio South* v. *City of San Diego* (1989) 209 Cal.App.3d 893, 904 [257 Cal.Rptr. 578] ["plain meaning" rule applicable to section 64, subdivision (c)].)

Fox concedes that as a result of the June 1981 transaction, "Fox Film became a wholly-owned subsidiary of Intermediate." Under section 64, subdivision (c), therefore, as interpreted by the Supreme Court, the acquisition of Fox by Intermediate constituted a change of ownership of the former's real property holdings thus triggering reassessment. From this conclusion, Fox demurs.

In its view, it was not Intermediate that acquired Fox but, rather, the investors who created Intermediate, Holdings, and Acquisitions.[4] Since no one investor owned a greater than 50 percent interest, Fox reasons that no change of ownership occurred as defined by sections 64, subdivision (c) and 25105. To reach this conclusion, Fox urges us to go beyond the form to the substance of the transaction for the purpose of determining who gained "ultimate control" of Fox's property.

The same argument, albeit in a different factual setting, was soundly rejected in the recent case of *Kraft, Inc.* v. *County of Orange* (1990) 219 Cal.App.3d 1104 [268 Cal.Rptr. 643].

In *Kraft*, Kraft, Inc., and Dart Industries, Inc., formed a new corporation, Dart & Kraft, Inc. (DKI). DKI then set up two subsidiary corporations which were merged with Kraft and Dart, as a result of which they

---

[4] Fox finds it of particular significance that Holdings, Intermediate and Acquisitions were "shell" corporations with no corporate purpose or activity beyond the acquisition of Fox. Fox does not question, however, that each was a duly formed corporation, nor does it argue that they were merely alter egos of the investors who created them.

became subsidiaries of DKI. As part of the transaction, the Kraft and Dart shareholders converted their stock for DKI stock. The former Kraft shareholders became owners of 51.5 percent of DKI stock and the former Dart shareholders received the remaining 48.5 percent. The County of Orange reassessed Kraft properties in the City of Buena Park. Summary judgments were granted to the county and city in Kraft's subsequent action for refund.

On appeal, Kraft contended, as is contended here, that the court was required to look through the corporate form to decide which shareholders held ultimate control of the property to be reassessed. Kraft argued that Kraft's former shareholders, and not DKI, held ultimate control.

"Kraft contends the 'ultimate control' theory requires looking through the corporate form to determine which shareholders hold the essential element of control. Under the 'ultimate control' theory, a change in property ownership occurs if a single shareholder gains majority control of a corporation through purchase of shares. Kraft argues *ultimate control* is not vested in DKI because it is the former Kraft shareholders who ultimately control the property owned by Kraft.

"Subdivision (a) of section 64 reflects the ' "separate entity" ' theory, i.e., the notion found in our general law that corporations, partnerships, joint ventures, and associations have an identity apart from that of the owners.' (*Sav-on Drugs, Inc.* v. *County of Orange* [1987] 190 Cal.App.3d [1611,] 1620.) Thus, the general rule is that the transfer of corporate stock is not deemed a transfer of the real property of a legal entity because the separate legal entity still owns the property. Section 64, subdivision (c), as an exception to that general rule, reflects the 'ultimate control' theory, which looks through the title holder to the entity ultimately responsible. (*Title Ins. & Trust Co.* v. *County of Riverside, supra,* 48 Cal.3d at pp. 89-90, fn. 3.) The ultimate control theory, however, does not require, as Kraft contends, that we are to ignore all intermediary entities and look only to the shareholders of the parent company which indirectly controls the title-holding subsidiary corporation. The former Kraft shareholders are now merely individual shareholders in DKI; and DKI is the controlling entity.

" 'Section 64(c) specifies two means by which a change of ownership may occur. The first is if one corporation, by purchasing stock, obtains direct control of another which owns the property allegedly subject to reassessment.' (*Title Ins. & Trust Co.* v. *County of Riverside, supra,* 48 Cal.3d at p. 92.) This occurred when DKI acquired the stock of Kraft. The wording

of section 64, subdivision (c) clearly applies to Kraft." (*Kraft, Inc.* v. *County of Orange, supra,* 219 Cal. App.3d at pp. 1107-1110, fn. omitted.)

We agree with the conclusion drawn by the *Kraft* court. In the case before us, the ultimate control theory does not require that we ignore the corporate entity, Intermediate, which acquired full control of Fox in the June 1981 transaction, to focus instead on the individual investors.

Fox condemns *Kraft* as "conclusory" and "inconsistent with the Legislative intent underlying Section 64(c) and the holding on *Sav-on* [*Drugs, Inc.* v. *County of Orange, supra,* 190 Cal.App.3d 1611]." This criticism is unfounded.

In the first place, as we have seen, the legislative intent underlying section 64, subdivision (c) was to achieve some degree of parity of the tax burden imposed on individual and corporate purchasers of real property, an objective that would be foiled by Fox's reading of the subdivision. Second, far from being inconsistent with the *Sav-on* decision, the *Kraft* decision came out of the same court that decided *Sav-on* and was authored by one of the justices who concurred in the earlier case.

*Sav-on* supports the *Kraft* court's view of the ultimate control theory. In *Sav-on,* the court stated, "it is clear the Legislature understood Proposition 13 to mean a reassessment should be permitted when, using control of the entity as its touchstone, a true change in ownership occurs (subd. (c)), but not otherwise (subd. (b))." (*Sav-on Drugs, Inc.* v. *County of Orange* (1987) 190 Cal.App.3d 1611, 1620 [236 Cal.Rptr. 100].) "In other words, the Legislature has determined article XIII A was meant to apply in the case of 'true' changes in ownership but not 'paper' ones." (*Id.* at p. 1618.)

Neither we nor the trial court is required to look behind the corporate forms to individual investors or shareholders in this situation. (See also *Pueblos Del Rio South* v. *City of San Diego, supra,* 209 Cal.App.3d at p. 903 ["the 'ultimate control' rationale should cause reappraisals after transfers of real property when majority controlling ownership in a corporation changes. [Citation.]"].) We find no support for Fox's reading of the ultimate control theory.[5]

---

[5] Fox's reliance on certain language in *Pueblos Del Rio South* v. *City of San Diego, supra,* 209 Cal.App.3d 893, is misplaced. Considered as a whole, that opinion, based on a factual situation unlike the one presented here, does not support Fox's view of the ultimate control theory.

Accordingly, the judgment is affirmed. Respondents to recover their costs on appeal.

George, J., and Epstein, J., concurred.